**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Timmy Lee BRUMLEY et al., Defendants-Appellants.**

**Nos. 72–1044 to 72–1046.**

United States Court of Appeals,
Tenth Circuit.

Aug. 14, 1972.

Rehearing Denied Sept. 1, 1972.

10. We are not now faced with a problem where there exists a conflict between the two laws.

Stephen K. Lester, Asst. U. S. Atty., Wichita, Kan. (Robert J. Roth, U. S. Atty., Wichita, Kan., on the brief) for appellee.

Alvin D. Herrington, Wichita, Kan., for appellants.

Before HILL, SETH, and BARRETT, Circuit Judges.

BARRETT, Circuit Judge.

Timmy Lee Brumley, Edward Dean Chill, and Charles Edward Drane were convicted of burglary of the Wilmore State Bank (Bank), of Wilmore, Kansas, in violation of 18 U.S.C. § 2113 and 18 U.S.C. § 2. Brumley and Drane were sentenced to the custody of the Attorney General in accordance with the Youth Correction Act. Chill received an eight year indeterminate sentence.

The Bank is located in Comanche County, Kansas, a small, sparsely populated county of 3,200, which abuts the Kansas-Oklahoma line. The three major communities within the county include Wilmore, Coldwater, and Protection. Wilmore has a population of 150 and Coldwater and Protection have populations of 1,275 and 900, respectively.

On December 17, 1970 the Bank was burglarized at about 3:15 a. m. Al Eckert, who lived across the street from the Bank, was awakened by the Bank's burglar alarm. Eckert got up, looked out his window and saw a car pulling out of the driveway of a grain elevator near the Bank. The car was headed north out of Wilmore. Mr. Eckert described the car as an older model, dark in color, with a sloping back. Eckert called Lester Fry, a cashier at the Bank. Upon Fry's arrival, Eckert and Fry entered the Bank. They found a broken window and miscellaneous tools scattered on the floor. The vault was closed but the combination knob of the vault had been noticeably damaged. This apparently activated the alarm.

Fry opened the vault and turned off the alarm. A cursory inventory of the vault and the Bank proper indicated that the only missing item was a small plastic container in which the Bank kept a small amount of petty cash. This container usually consisted of change. Fry called Sheriff Hackney who lived nearby in Coldwater, and reported the burglary. He related what Eckert had seen.

Sheriff Hackney immediately radioed several law enforcement officials including Nolan Spreier, City Marshal of Coldwater. He informed them of the bank robbery and specifically requested that they be alert for a dark colored car.

Sheriff Hackney then left Coldwater and drove to Wilmore. Shortly after

leaving Coldwater, Hackney observed an older, dark-colored car driving toward Coldwater. He called Spreier and asked him to check it out. Pursuant to Sheriff Hackney's call, Spreier stopped a black 1965 Chevrolet occupied by the appellants. Spreier asked the appellants to exit the car and wait until the deputy sheriff arrived.

Within several minutes Mayor Bransom, a deputy sheriff, and Undersheriff Sherman arrived. Sherman talked briefly with Spreier and then asked the appellants, "What's going on?" The appellants related that they had been on their way to Hutchinson to play pool but had decided to return to Woodward when it got late. Sherman then asked the appellants if he could look in the trunk of the car, and after each indicated he could, Chill opened the trunk. Sherman observed a pair of coveralls, a pair of leather gloves and "a cardbox full of burglary tools" in the trunk.

Undersheriff Sherman then lined the appellants up next to their car, frisked them, and then, with the help of Marshal Spreier and Mayor Bransom, took them to the Courthouse. Upon reaching the Courthouse, Sherman advised the appellants of their rights. He then asked them to empty their pockets. Drane and Brumley each had about $15 in change and loose bills in their pockets. The appellants were then jailed.

Glen Dillinger, an employee at the elevator across the street from the Bank, testified that the elevator had been broken into and that eight packs of Pall Mall cigarettes, two pairs of work gloves, one leather and one cotton, along with $35.39 in cash, had been stolen from the elevator sometime between closing on December 16, 1970 and opening on December 17, 1970. Special Agent James F. Miller of the F.B.I. drove along the getaway route and found five packages of Pall Mall cigarettes, some white cotton work gloves, two Coors beer cans (with Oklahoma stamped on the top of each), and a small plastic container similar to the one taken from the Bank.

On the morning of the 17th, Special Agent James B. Kelly searched the 1965 Chevrolet after obtaining a written consent to search it from the owner, Brumley. Kelly found, among other things, a package of Pall Mall cigarettes, which bore the same Kansas tax stamp number as the cigarettes stolen from Mr. Dillinger, and the same number as the cigarettes found along the getaway route, and three Coors beer cans, each of which had "Oklahoma" stamped on the top.

Additional evidence was also introduced at the trial based upon the scientific testing of evidence by the F.B.I. Microscopic leather fibers on one of the beer cans found along the getaway route were the same as and could have originated from the leather gloves found in the car. Synthetic fibers were found on another beer can that microscopically matched the synthetic fibers taken from the floor of the car. The composition, design, and sewing threads of two white cotton gloves, one found in the car and the other along the getaway route, were the same.

Also, glass particles found in the cuff of Chill's pants matched the physical and optical properties of the glass fragments from the broken window of the Bank. Paint particles found in the coveralls recovered from the trunk of the car could have had a common source with the paint particles on the tools in the Bank.

The appellants contend that: (1) the searches of Brumley's automobile were illegal and in violation of their constitutional rights and that all evidence seized and admitted pursuant to such searches should have been excluded by the trial court; (2) the grand jury indictment under which they were tried should have been dismissed by the trial court because of their uninformed waiver of the right to a preliminary hearing; and (3) they were denied a fair trial by the cumulative prejudice to "substantial rights" resulting from the Government's refusal to produce evidence, from the speculative and conjectural reasoning of expert witnesses, and from expert testi-

mony based upon evidence that was destroyed during the course of the testing.

## I.

Taking the allegations of error in the order presented, we must first determine whether the searches of the automobile were lawful. The appellants contend that their case is controlled by *Dyke v. Taylor Implement Manufacturing Co., Inc.*, 391 U.S. 216, 88 S.Ct. 1472, 20 L.Ed.2d 538 (1968), and that since the vehicle was subjected to warrantless searches without "probable cause" they are entitled to a new trial with all the "tainted" evidence excluded. We hold that this contention is without merit.

*Dyke* is not controlling herein because it is distinguishable from our case. In *Dyke*, the defendants were apprehended, arrested and taken back to the jail. The arresting officers searched the defendants' car while they were waiting inside the jail. In our case, the defendants were not arrested and taken to jail prior to their car being searched. Rather, they were merely detained by Marshal Spreier for a reasonable investigative inquiry and upon consenting to a search of their car, Chill opened the trunk for Undersheriff Sherman to conduct the search.

■■ Marshal Spreier was not acting improperly in stopping the Brumley car, since "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). Temporary detention and questioning of persons by police officers in the course of their duties is proper even though there are insufficient grounds for arrest. *United States v. Saldana*, 453 F.2d 352 (10th Cir. 1972); *United States v. Sanchez*, 450 F.2d 525 (10th Cir. 1971). See also *United States v. Troutman*, 458 F.2d 217 (10th Cir. 1972).

"*The Fourth Amendment does not require a policeman who lacks the pre-cise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, Terry recognizes that it may be the essence of good police work to adopt an intermediate response. See id., [392 U.S.] at 23 [88 S.Ct. at 1881]. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.*" Adams, Warden v. Williams, 407 U.S. 143, p. 145–146, 92 S.Ct. 1921, p. 1923, 32 L.Ed.2d 612 (1972). (Emphasis ours).

Given the description of the car although sketchy, Marshal Spreier acted properly in stopping the car, in a town such as Coldwater, a small Kansas hamlet where often times not a single car will pass through town during an entire evening.

■ The Government has the burden of proving consent for the warrantless search. *United States v. Miles*, 449 F.2d 1272 (10th Cir. 1971). The Government met its burden of establishing the voluntariness and validity of the consent. The admission of evidence lies largely within the trial court's discretion and will not be set aside on appeal except for a clear abuse of that discretion. *United States v. Wainwright*, 413 F.2d 796 (10th Cir. 1969), cert. denied, 396 U.S. 1009, 90 S.Ct. 566, 24 L.Ed.2d 501 (1970). Also, since jurors are charged with the duty of weighing and assessing the credibility of witnesses, a re-evaluation of credibility is not a function for the appellate court. *United States v. Sierra*, 452 F.2d 291 (10th Cir. 1971); *Chavez v. United States*, 258 F.2d 816 (10th Cir. 1958). We find no error.

The appellants also allege that they should have been apprised of their right not to consent to the search. However, no specific warning need be given. *Leeper v. United States*, 446 F.2d 281 (10th Cir. 1971); *White v. United States*, 444 F.2d 724 (10th Cir. 1971). This is espe-

cially true where, as here, the appellants not only orally consented to the search at the scene of the stop, but Brumley later signed a written consent to the search.

■ The appellants make a token argument that the "search" at the courthouse, which occurred when the Undersheriff "looked in the car," was in violation of their constitutional rights. The record does not indicate that either Drane or Chill claimed any of the contents of the vehicle admitted into evidence. We find that this allegation is without merit.

## II.

The appellants allege that the grand jury indictment under which they were tried should have been dismissed by the trial court because of their uninformed waiver of the right to a preliminary hearing. A brief recapitulation of the facts will facilitate consideration of this allegation.

The appellants were arrested on December 17, 1970 and thereafter charged by complaint, dated December 21, 1970. A preliminary hearing was set for December 31, 1970. Prior to December 31, 1970, the appellants tried unsuccessfully to obtain their own attorney. On December 31, 1970 the appellants appeared before the United States Magistrate and asked that the hearing scheduled for that date be continued because they had been unable to acquire counsel of their choice. The hearing was continued until January 15, 1971. Counsel was then appointed for each of the appellants. On January 14, 1971 a grand jury indicted the three appellants. They now claim reversible error, contending that the indictment should have been dismissed because of their uninformed waiver of their right to a preliminary hearing.

The Government argues that the appellants were fully aware that they would waive their right to a preliminary hearing if a Grand Jury indictment were entered against them before the date of the hearing because they signed a consent form which stated in part that

"I have the right to have a Preliminary Examination in my case within ten (10) days from December 23, 1970, in accordance with 18 U.S.C. § 3060(c), do hereby voluntarily consent that the Preliminary Examination in my case will, unless I waive the same or I am indicted by a Grand Jury, be held more than ten (10) days from December 23, 1970." The appellants allege that the consent form signed by them must necessarily be considered a nullity because they were never informed that it was anything more than a consent to have their Preliminary Examination more than ten days after December 23, 1970.

In support of their allegations the appellants rely heavily on Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L. Ed.2d 387 (1970), for the proposition that a preliminary hearing is a critical stage at which a defendant is entitled to counsel. We do not question the sagacity of *Coleman*. However, it cannot be considered controlling herein because a preliminary hearing was never held. The magistrate appointed counsel for the appellants on the same day that he continued their hearing to January 15, 1971.

The appellants also rely heavily on Ross v. Sirica, 127 U.S.App.D.C. 10, 380 F.2d 557 (1967), in support of their contention that an error surrounding one's right to a preliminary hearing is not obviated by a grand jury indictment. The appellants' reliance is misplaced. We have previously considered the efficacy of these cases in United States v. Milano, 443 F.2d 1022 (10th Cir. 1971), cert. denied 404 U.S. 943, 92 S.Ct. 294, 30 L.Ed.2d 258 (1971), where Judge Coffin, of the First Circuit, sitting by designation, opined as follows:

"Defendant relies on Blue v. United States, 119 U.S.App.D.C. 315, 342 F. 2d 894 (1964), cert. denied, 380 U.S. 944, 85 S.Ct. 1029, 13 L.Ed.2d 964 (1965), and Ross v. Sirica, 127 U.S. App.D.C. 10, 380 F.2d 557 (1967), which did say that the preliminary examination also provided the defendant with discovery. But that is merely an

incidental benefit—which varies widely from case to case, depending on how much evidence the government produces at this early state—and not the statutory purpose. *Blue* and *Ross* have not been followed in other circuits. Cf. United States v. Karger, 439 F.2d 1108 (1st Cir. 1971). Moreover, 18 U.S.C. § 3060 was enacted after both cases, and, we think, clarifies the statutory purpose." 443 F.2d at 1025.

■ Since the sole function of a preliminary examination is to determine whether there is sufficient evidence to warrant the detention, United States v. Kysar, 459 F.2d 422 (10th Cir. 1972), we hold that its omission, whenever a complaint has been preempted by an indictment, does not constitute grounds for reversal. The appellants were not prejudiced for want of a preliminary hearing. We note, in passing, that each of the appellants remained free on bond during the pendency of this appeal.

### III.

The appellants allege that they were denied a fair trial by the cumulative prejudice to "substantial rights" resulting from the government's refusal to produce evidence, from the speculative and conjectural reasoning of expert witnesses, and from the expert testimony which was based upon evidence that was destroyed during the course of its being tested.

The Supreme Court only recently reaffirmed the standard set forth in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), which outlined the conditions under which the withholding of evidence denies a fair trial and due process. Moore v. Illinois, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972). Therein Justice Blackmun, speaking for the Court, opined:

"The heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the accused and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence." (p. 794, 92 S.Ct. p. 2568.)

■ Application of these standards convinces us that the appellants were not denied a fair trial. The evidence which the government allegedly failed to produce was not favorable to the defense, and although it was material, it was of a cumulative nature. We are in full agreement with *Moore* that "[w]e know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case," *Moore, supra,* (p. 795, 92 S.Ct. p. 2568)—especially in a case such as the one before us where no prejudice has been demonstrated.

■ The appellants allege that the statements of the Government's experts were pure speculation and conjecture and therefore inadmissible, and that they were denied the right of confrontation because paint particles used in comparison tests by the Government experts were consumed in the testing process. These allegations have no merit. This court has consistently held that the determination of the competency of a witness to give an opinion concerning a matter of expertise lies largely within the trial court's discretion, and this court will not usurp the trial court's discretion absent a clear showing of abuse. United States v. Kienlen, 415 F.2d 557 (10th Cir. 1969). In view of the fact that the appellants were afforded the opportunity to cross-examine the expert who performed the tests on the paint particles, they cannot now allege that they were denied their right of confrontation, merely because the paint particles were consumed during the test. The appellants have not shown any prejudice inasmuch as the paint particles were cumulative evidence.

We affirm.