**PIPELINERS LOCAL UNION NO. 798, TULSA, OKLAHOMA, and A. Leroy Jones, Plaintiffs-Appellants,**

v.

**Fred H. ELLERD, et al., Defendants-Appellees.**

No. 73-1880.

United States Court of Appeals, Tenth Circuit.

Argued July 9, 1974.

Decided Oct. 2, 1974.

Breitenstein, Circuit Judge, concurred in the result, with opinion.

Robert A. Hampe, St. Louis, Mo. (Richard L. Daly, St. Louis, Mo., on brief) for appellants.

Jon B. Clarke, Denver, Colo. (David J. Clarke, Denver, Colo., on brief) for appellees.

Before BREITENSTEIN, McWILLIAMS and BARRETT, Circuit Judges.

BARRETT, Circuit Judge.

Pipeliners Local Union # 798 (Union), and A. Leroy Jones (Jones), appeal from the judgment of September 24, 1973, awarding Intermountain Equipment Rentals, Inc. (Intermountain) $5,731.83 and costs on its counterclaim.

Intermountain, a Utah corporation qualified to do business in Colorado, submitted its bid to construct 20 miles of natural gas pipeline in San Miguel County, Colorado, for Rocky Mountain Natural Gas Company. Intermountain's stock is owned 90% by W. C. James and 10% by Ralph Pinkham. After Intermountain's bid was accepted, it entered into a 50–50 joint venture agreement with W. C. James and Associates, Inc. (Associates), a Utah corporation qualified to do business in Colorado. Associates' stock is owned 51% by Louis R. Morava and 49% by W. C. James. Under the joint venture agreement, of which Rocky Mountain Natural Gas Company was fully informed, Intermountain was to furnish most of the equipment and Associates was to furnish the financing. The joint venture hired W. C. James as its general project manager. It was to operate under the trade name of Associates. A third corporation, W. C. James, Inc. (James, Inc.), a Nevada corporation, whose stock is owned 100% by W. C. James and his wife, leased some of its equipment to the joint venture. Prior thereto, in August of 1970, James, Inc. had entered into a collective bargaining agreement with Union which expired by its own terms on April 30, 1973. Neither Intermountain or Associates were signators to that or any other collective bargaining agreement with Union.

In April of 1971, Jones, as business agent of Union, contacted W. C. James about the employment of Union welders and welder helpers on the project. The joint venturers declined to employ them. The construction was commenced in May of 1971 with non-Union welding workers. Jones insisted that Union members should be employed on the project. Associates continued to refuse to employ them. On the morning of Saturday, May 29, 1971, Jones came to the project area with some 20 to 26 Union members with the purpose of shutting down the job. Jones and the Union members climbed over a fence and entered a private right-of-way where they shut off equipment or instructed the operators to do so. They threatened Associates' non-Union workers. Jones and the Union members refused to leave the jobsite until finally ordered to do so by the Sheriff of Dolores County, Colorado. All work was necessarily cancelled for

the balance of that day. Associates felt compelled to hire a deputy sheriff and three night watchmen to patrol the jobsite even though the succeeding day, Sunday, was not a scheduled work day. Jones and Union members appeared at the jobsite again briefly on Monday morning. Associates lost the permanent services of twelve workers. The project was held up until their replacements could be hired and qualified for their assigned tasks.

The Sheriff of Dolores County testified by deposition that on the morning of May 29th, at the jobsite, Jones told him that he and the Union members had come to shut the job down. He testified that Jones was very belligerent; that he observed three hand guns in a van parked on the highway; that he was told by one of the non-Union workers that Jones and his associates had told them to "get over here and sit down" or they "will beat the hell" out of them.

Sheriff Ellerd of San Miguel County testified by deposition that on Monday morning following the Saturday jobsite encounter, he and other officers were escorting non-Union workers to the jobsite when he confronted Jones. Ellerd questioned Jones about a reported rock-throwing incident on Sunday. While Ellerd was frisking Jones, Jones made a quick turn. This alarmed Ellerd who struck Jones on the chin with an open palm.

Appellants Jones and Union contend that when Jones and the Union members went to the jobsite, they did so for the sole purpose of "visiting" with W. C. James in regard to the collective bargaining agreement the Union had entered into with James, Inc.

Following the events of May 29–31, Associates continued the construction work on the project with non-Union employees. Associates did not pay any fringe benefit contributions to the Union's benefit fund. The project was completed in July, 1971.

On July 6, 1971, the instant suit was filed by Union and Jones against the counties of San Miguel, Montrose and Dolores, Colorado, the three sheriffs of these counties, individually and in their official capacities, together with W. C. James, James, Inc. and Intermountain. The Complaint alleged that the events of May 31, 1971, giving rise to the Civil Rights action, occurred at a time when Jones and the two Union members were parked in a car, off of the jobsite on a public highway, and when they were not interfering with any work activity. They alleged that their rights under the Fourth, Sixth and Fourteenth Amendments to the Constitution of the United States were violated, contrary to the Civil Rights Act, 42 U.S.C.A. §§ 1983 and 1985, to-wit: Unlawful search; use of physical violence and abuse without cause; unlawful search of the automobile; abusive and unwarranted frisking of Jones and the two Union members in his company; violent striking of Jones rendering him unconscious, with further physical abuse of Jones by use of fists, which required medical care, resulting in permanent impairment entitling Jones to award of actual damages of $250,000.-00; ordering Jones and his Union companions to get out of the three counties above named, with instructions to deputy sheriffs by Sheriff Ellerd to consider Jones and other members of the Union as "armed and dangerous" and with instructions to "shoot to kill"; that after leaving the scene the three sheriffs followed to insure that Jones and companions left the three counties; that on May 29, 1971, W. C. James informed Jones that if he appeared on the jobsite, James would call the police to cause Jones to be thrown in jail. In addition to actual damages sought by Jones, both Jones and Union sought punitive damages of $1,000,000.00 each, against the defendants and each of them.

Intermountain filed an Answer generally denying the allegations of the Complaint and, as an affirmative defense pled that any injuries or damages suffered by plaintiffs were incurred while Jones and the Union members were engaged in a violation of provisions of the

Colorado Labor Peace Act, C.R.S.1963 Ann., Ch. 80–4–1 through 80–4–22, as amended. In addition, Intermountain counterclaimed, alleging that because of the events of May 29–31, 1971, engendered by the plaintiffs, it had been damaged $14,808.25 for costs involving the protection of laborers and material, the replacement of three operators, five welders, one helper and three laborers who quit their jobs following threats made by plaintiffs, together with the delay and loss of at least two days' production on the project.

During the months of November and December, 1971, the defendants moved for dismissal of the Union's Complaint. Memorandums were filed by the defendants asserting that the Union's Complaint failed to state a cause of action. The Union did not file a memorandum in opposition to the motions. On February 9, 1972, the Court dismissed the Union's Complaint.

On September 26, 1973, pursuant to an oral stipulation made in open court on September 24, 1973, an Order was entered dismissing with prejudice the Complaint of both Union and Jones relating to all claims and against all parties. All parties agreed that the counterclaim of Intermountain survived and that it should be tried to the Court without a jury. Following trial the Court delivered oral findings of fact, conclusions of law and judgment from which this appeal is taken.

Appellants jointly allege Trial Court error in that: (1) it improperly entered its Order on February 9, 1972, granting defendants-appellees Motions to Dismiss Union's complaint on the ground that it failed to state a claim upon which relief could be granted; (2) it admitted into evidence Intermountain's Exhibits I, D, D–1, T–2, T–3, T–4 and S as "business records" even though they did not qualify as such under the Business Records exception to the Hearsay Rule, and further by reason of Intermountain's failure to establish a proper foundation for their admission; (3) it failed to find a

violation of the Colorado Labor Peace Act which is a prerequisite to the entry of judgment on the counterclaim; and (4) it granted damages for a sum of money paid for "watchmen" which was too remote; improperly permitted W. C. James to estimate the percentage of efficiency lost on the job, which was an unsubstantiated conclusion and opinion; found a "loss of efficiency" on the jobsite, lacking substantial evidence; and, granted judgment on the counterclaim even though Intermountain failed to meet its burden of proof.

I.

At the threshold we must determine whether the District Court had jurisdiction over Intermountain's counterclaim following dismissal of plaintiffs' Complaint and all claims with prejudice. It is the contention of appellants that the Court was without jurisdiction over the counterclaim in view of the prior voluntary dismissal of the Complaint by plaintiffs in that the counterclaim is permissive rather than mandatory in nature. Union and Jones contend that following dismissal of the Complaint, the counterclaim failed for want of an independent basis requisite for jurisdiction under Rule 13(b), Fed.R.Civ.P., 28 U.S. C.A. Intermountain argues, alternatively, that its counterclaim: (a) was based on independent jurisdictional grounds, i. e., diversity of citizenship and amount in controversy required to satisfy 28 U.S.C. § 1332(a); and (b) that even if no independent jurisdictional ground to support the counterclaim exists, that the Court properly retained ancillary jurisdiction, because the counterclaim is compulsory.

Rule 13(a), Fed.R.Civ.P., provides, inter alia:

(a) Compulsory Counterclaims.

A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, *if it arises out of the transaction or occur-*

*rence that is the subject matter of the opposing party's claim . . . .* (Emphasis supplied).

▮ A related or compulsory counterclaim—as distinguished from a permissive counterclaim—*must* be pleaded or it is barred. *See* Wright and Miller, Federal Practice and Procedure, Civil § 1417 and cases cited.

▮ A federal district court may assert jurisdiction of a claim which is a continuation of, or incidental and ancillary to, a principal claim over which it has jurisdiction, even though it might not have jurisdiction of the ancillary proceedings if it were an independent and original action or proceeding. Aetna Insurance Company v. Chicago, Rock Island and Pacific Railroad Company, 229 F.2d 584 (10th Cir. 1956); Wright, Federal Practice and Procedure, § 1414 at 69–71. This is so because the ancillary claim is referable to or dependent upon the jurisdiction of the court over the principal suit or proceeding. United States v. Acord, 209 F.2d 709 (10th Cir. 1954). In Inter-State National Bank of Kansas City v. Luther, 221 F.2d 382 (10th Cir. 1955), cert. dismissed 350 U. S. 944, 76 S.Ct. 297, 100 L.Ed. 823 (1956), we held that:

> Counterclaim under Rule 13, F.R.C.P., includes both setoff and recoupment, and is broader than either in that it includes other claims and may be used as a basis for affirmative relief. See Clark Code Pleading, 2d Ed. 637, cited 3 Moore's Federal Practice, § 13.02, p. 9. Rule 13(a), F.R.C.P., provides for compulsory counterclaim "if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim * * *." Rule 13(b) provides for a permissive counterclaim . . . the only difference . . . we need to note is that the compulsory counterclaim, being ancillary to the claim, derives its jurisdiction from the same source, whereas a permissive counterclaim not arising out of the same transaction or occurrence must rest upon independent

grounds of jurisdiction . . . . being of the view that the Bank *impliedly consented* to the jurisdiction of the court, the counterclaim was maintainable under Rule 13(b), F.R.C.P., whether compulsory or permissible. See 3 Moore's Federal Practice §§ 13.-18–13.19. (Emphasis supplied.) 221 F.2d at 390.

▮ The courts have given the terms "transaction" and "occurrence" contained in Rule 13(a), *supra,* flexible and realistic constructions in order to effect "judicial economy", i. e., trial in one action of all related controversies between the parties and, of course, the avoidance of multiciplicity of suits. Southern Construction Co., Inc. v. Pickard, 371 U.S. 57, 83 S.Ct. 108, 9 L.Ed.2d 31 (1962); Moore v. New York Cotton Exchange, 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926); State of Iowa v. Union Asphalt & Roadoils, Inc., 409 F.2d 1239 (8th Cir. 1969); Great Lakes Rubber Corporation v. Herbert Cooper Co., Inc., 286 F.2d 631 (3rd Cir. 1961); Glens Falls Indemnity Company v. United States ex rel. Westinghouse Electric Supply Company, 229 F.2d 370 (9th Cir. 1955); Wright and Miller, Federal Practice and Procedure, § 1409. *See* also Fed.R.Civ.P., Rule 54(b), 28 U.S.C. A.

▮ It has been said that most courts, rather than attempting to define the key terms of Rule 13(a), *supra,* precisely, have preferred to suggest standards by which the compulsory or permissive nature of specific counterclaims may be determined: (1) Are the issues of fact and law raised by the claim and counterclaim largely the same? (2) Would res judicata bar a subsequent suit on defendants' claim absent the compulsory counterclaim rule? (3) Will substantially the same evidence support or refute plaintiffs' claim as well as defendants' counterclaim? and (4) Is there any logical relation between the claim and the counterclaim? *See* Wright and Miller, Federal Practice and Procedure, Civil § 1410, Ch. 4, p. 42

and cases cited. On the totality of the facts presented, we hold that while many of the issues of fact and law are largely the same, and while much of the same evidence would support or refute plaintiffs' claim as well as defendants' counterclaim, the one compelling test of compulsoriness met here is that both the original claims of plaintiffs-appellants and the counterclaim of defendant-appellee arose out of the same "transaction or occurrence" which logically relate by reason of their common origin. The "logical relation" test is the most controlling. Moore v. New York Cotton Exchange, *supra*; Wright, Law of Federal Courts, 1970 Ed., Ch. 10, Counterclaims, pp. 346–347; 1A Barron & Holtzoff, Wright ed., § 394.

■■ The exercise of federal jurisdiction over claims against parties as to whom there exists no independent basis for jurisdiction finds substantial analogies in the joinder of new parties under the doctrine of ancillary jurisdiction within the context of compulsory counterclaims under Rule 13(a), *supra*. H. L. Peterson Company v. Applewhite, 383 F.2d 430 (5th Cir. 1967); Albright v. Gates, 362 F.2d 928 (9th Cir. 1966); United Artists Corporation v. Masterpiece Productions, Inc., 221 F.2d 213 (2nd Cir. 1955). These decisions are also authorities for the rule that in deciding what is a "transaction" or "occurrence", the terms must be accorded liberal construction. And if the counterclaim is held to be compulsory, it is settled that the court has ancillary jurisdiction to decide it even though the plaintiffs' claim be dismissed. Moore v. New York Cotton Exchange, *supra;* Kirby v. American Soda Fountain Company, 194 U.S. 141, 24 S.Ct. 619, 48 L.Ed. 911 (1904); United States for Use & Benefit of D'Agostino Excavators, Inc. v. Heyward-Robinson Company, 430 F.2d 1077 (2nd Cir. 1970), cert. denied 400 U.S. 1021, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971); Atlantic Corporation v. United States, 311 F.2d 907 (1st Cir. 1962); Home Ins. Co. of New York v. Trotter, 130 F.2d 800 (8th Cir. 1942); Wright and Miller, Federal Practice and Procedure, Civil, §§ 1414, Ch. 4, p. 78; 2365 Ch. 7, p. 175; Wright, Law of Federal Courts, §§ 9, 79 (2d Ed. 1970).

■ Appellants argue that the trial court erred in finding, prior to the hearing on the counterclaim, that Union's Complaint had failed to state a claim upon which relief could be granted. Motions to Dismiss were filed against Union's Complaint by all of the Defendants. On February 9, 1972, the Court entered its Order granting the Motions to Dismiss on the ground that the "complaint does not state a claim in behalf of plaintiff, Union, upon which relief can be granted as against any defendant." Intermountain contends that this constituted a final order requiring filing of notice of appeal under F.R.A.P., Rules 3(a) and 4(a), 28 U.S.C.A., with the clerk of the district court within 30 days of the date of the Order appealed from. We hold that the Order was not a final order or judgment, however, because it does not meet the requirements of Fed. R.Civ.P. 54(b), 28 U.S.C.A. for failure to contain an express determination that there is no reason for delay and expressly directing entry of judgment. Absence thereof failed to terminate Union's action as to its claim. Prior to the trial on Intermountain's counterclaim, however, counsel for Union and Jones did, in open court, explicitly and unqualifiedly stipulate that all actions "as to all parties with the exception of the parties to the counterclaim" were dismissed with prejudice, each party to pay its own costs. (R., Vol. II, pp. 2–4). The stipulation was made in open court on September 24, 1973. We hold that it constituted a voluntary dismissal of the complaint and claims of Union and Jones supportive of the Order of Dismissal entered by the Court on September 26, 1973 (R., Vol. VI, p. 100), even though no formal stipulation of dismissal was signed by all of the parties to the action as contemplated by Fed.R.Civ.P., Rule 41(a), 28 U.S.C.A. No contention is made that the Trial Court abused its discretion in entering the Order of Dis-

missal on September 26, 1973. We hold that it did not. Davis v. Operation Amigo, Inc., 378 F.2d 101 (10th Cir. 1967). It is significant, we believe, that appellants' supplemental memorandum on appeal refers to the dismissal order of September 26, 1973, as one "voluntarily" agreed upon by plaintiffs-appellants. The voluntary dismissal constitutes a bar to appellants' attack upon the Order of Dismissal of February 9, 1972. *See* Inter-State National Bank of Kansas City v. Luther, *supra.*

Appellants cannot now be heard on their contention that the Trial Court erred in entering its order of February 9, 1972, dismissing Union's complaint on the ground that it "does not state a claim . . . . upon which relief can be granted" in light of their subsequent voluntary dismissal of their respective complaints and causes of action. That being so, the District Court then had jurisdiction only over the Intermountain counterclaim.

## II.

 Appellants allege Trial Court error in the admission in evidence of Intermountain's Exhibits I, D, D–1, T–2, T–3, T–4 and 5 as "business records" in that they did not qualify under the Business Records exception to the hearsay rule and that Intermountain failed to establish proper foundation and identification and basis for their admission.

 Each of the exhibits challenged were listed and identified in the Trial Court's pre-trial order. (R., Vol. VI, p. 92). They related to expenses incurred by Intermountain resulting from the Jones-Union members encounter on the project property. They represent entries kept by Intermountain in the regular and ordinary course of its business. Intermountain's office manager, Jack V. Mott, testified that each of the exhibits represented records pertaining to the "permanent records and the jobsite records for the construction" from information within his personal knowl-

edge, or that regularly submitted to him in the ordinary course of business. Mott testified that Exhibits I and S, daily cost records, were personally prepared by him on a daily and weekly basis predicated, in part, upon invoices, footages achieved, and time cards turned in by the foreman of each phase of the project's prior day's work. (Vol. II, pp. 41, 43, 44, 55, 78–80). All of the exhibits were identified and utilized by Mott based either on his personal knowledge, or reliable accounts and records kept in the ordinary course of business. They qualify as "business records" within the hearsay rule exception. United States v. Sparrow, 470 F.2d 885 (10th Cir. 1972), cert. denied 411 U.S. 936, 93 S.Ct. 1913, 36 L.Ed.2d 397 (1973); Woodring v. United States, 376 F.2d 619 (10th Cir. 1967), cert. denied 389 U.S. 885, 88 S.Ct. 153, 19 L.Ed.2d 182 (1967); Powell v. Brady, 30 Colo.App. 406, 496 P.2d 328 (1972); 28 U.S.C.A. § 1732. The admissibility of evidence is discretionary with the trial court and will not be disturbed on appeal unless clearly erroneous. United States v. Brumley, 466 F.2d 911 (10th Cir. 1972), cert. denied 412 U.S. 929, 93 S.Ct. 2755, 37 L.Ed.2d 156 (1973); United States v. Acree, 466 F.2d 1114 (10th Cir. 1972), cert. denied 410 U.S. 913, 93 S.Ct. 962, 35 L.Ed.2d 278 (1973). And in Hodgson v. Okada, 472 F.2d 965 (10th Cir. 1973), we said:

> The trial court found that "there are no adequate records which permit anyone to compute, with any degree of certainty at all, the amount of underpayment." The Court proceeded to make its computations of underpayment to the pickers on the basis of testimony of three of the pickers contained in depositions, which the trial court observed to "constitute a maze of total and complete confusion." The Court then averaged the wages from the deposition testimony, made adjustments, and arrived at the figure of $1,279.90 as the amount due predicated on thirteen pickers who worked 5½ days per week or 44 hours per week for four weeks. 472 F.2d at 969.

We there held that the award was not arbitrary. And in Boehm v. Fox, 473 F.2d 445 (10th Cir. 1973), we held that notwithstanding a timely objection lodged at trial, a witness may testify from summaries in lieu of original records if used to refresh his memory, and that such testimony is not violative of the best evidence rule. The objection there lodged to the testimony, was based upon the incompetency of the witness, failure to lay a foundation, and because the testimony was based on hearsay. The exhibits were further admissible under the liberal provisions of Fed.R. Civ.P., Rule 43(a), 28 U.S.C.A., and other Colorado decisions. Department of Highways v. Intermountain Terminal Company, 164 Colo. 354, 435 P.2d 391 (1967); Hobbs v. Breen, 74 Colo. 227, 220 P. 997 (1923). Mott was voir dired and thoroughly cross-examined. There was no abuse of discretion in the admission of the exhibits.

### III.

Appellants argue that the Trial Court erred in failing to find they had violated the Colorado Labor Peace Act, C.R.S.1963, 80–4–1, et seq., as amended, as a prerequisite to the entry of judgment on Intermountain's counterclaim. They contend that in view of the fact that Intermountain relied upon the Act in pleading its counterclaim, that it must first utilize the administrative provisions of the Act in seeking a remedy in lieu of the instant action. Intermountain pled the Act in its Affirmative Defenses to the Complaint and in its Counterclaim to this extent:

> 7. The activities of plaintiffs as hereinabove set forth constituted unfair labor practices under the Colorado Labor Peace Act, Chapter 80, Article 4 of Colorado Revised Statutes, 1963, as amended, for which plaintiffs are liable for damages under section 19 thereof.

(R., Vol. VI., p. 48).

We hold that this allegation cannot be construed to foreclose Intermountain's right to an independent remedy. The issue was resolved by the Colorado Supreme Court in Denver Building and Construction Trades Council v. Shore, 132 Colo. 187, 287 P.2d 267 (1955). There the employer invoked the Act in a suit for injunctive relief and damages. The defending union contended that the employer's exclusive remedy was via administrative proceedings set forth in the Act. The Court rejected this argument, holding that recovery in damages for injury incurred as a result of illegal practices is founded in tort and that tortious conduct may be remedied in a common-law action for damages. We agree.

### V.

Finally, appellants contend that the Trial Court erred in granting damages in a sum paid for "watchmen" which was too remote; that W. C. James was improperly permitted to estimate the percentage of efficiency lost on the job, which was an unsubstantiated conclusion and opinion; that there was a lack of substantial evidence relating to the Court's findings of "loss of efficiency" on the jobsite; and that Intermountain failed to carry its burden of proof. We disagree.

The Trial Court's finding that employment of the watchmen was justified by the facts and circumstances is fully supported by the record. The same is true of the mileage paid to the sheriff. The record is undisputed on the fact that twelve employees were coerced and intimidated to the extent that they quit their jobs, and that the remaining employees were nervous and apprehensive and that, as a result, the "loss of efficiency" in production was based on expert estimates of damages related to facts established at trial. We have held that when the cause and existence of damages has been established with requisite certainty, recovery will not be denied because the amount of

such damages is difficult to determine with mathematical preciseness. Hodgson v. Okada, *supra*; A to Z Rental, Inc. v. Wilson, 413 F.2d 899 (10th Cir. 1969).

We affirm.

BREITENSTEIN, Circuit Judge (concurring in result).

The complaint asserts violation of civil rights by reason of physical violence which occurred when union representatives sought to shut down a construction project because of a refusal to employ only union labor. The plaintiff union and one of its representatives claimed violation of 42 U.S.C. §§ 1983 and 1985. Jurisdiction was asserted under 28 U.S.C. § 1343. Defendant employers asserted a counterclaim for expenses incurred as a result of plaintiffs' actions. No objection was made to the assertion of the counterclaim and judgment was entered thereon in favor of the employers. If the counterclaim was compulsory, there is ancillary federal jurisdiction.

My trouble with the opinion is the possibility that it will be taken as a general approval of counterclaims in civil rights actions. I have been unable to find any authority on the point. On the record presented both the violence and the additional expenses arose out of the Union's effort to close down the job. Satisfaction of the "transaction or occurrence" requirement of Rule 13(a), F.R.Civ.P., should be determined in the first instance by the trial court. Here, the problem was not presented to the trial court and we should not make a de novo determination. Implicit in the decision of the trial court is recognition that the counterclaim was compulsory and, hence, ancillary jurisdiction was present.

On the particular facts of this unique case, coupled with the failure of the plaintiffs to object in the trial court to the counterclaim, I would affirm but I would leave open the question of recognition generally of compulsory counterclaims in civil rights actions.