The **LIBERTY NATIONAL BANK & TRUST COMPANY OF OKLAHOMA CITY, a National Banking Corporation, Plaintiff-Appellant,**

v.

**ACME TOOL DIVISION OF the RUCKER COMPANY et al., Defendants-Appellees.**

**No. 75–1422.**

United States Court of Appeals, Tenth Circuit.

Aug. 12, 1976.

On Rehearing Sept. 27, 1976.

---

Val R. Miller of Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick, Oklahoma City, Okl., for plaintiff-appellant.

James A. Kirk of Linn, Helms, Kirk & Burkett, Oklahoma City, Okl. (Mark A. Robertson of Linn, Helms, Kirk & Burkett, Oklahoma City, Okl., on the brief), for defendant-appellee, Hazel Bailey.

LEWIS, C. J., and BREITENSTEIN, HILL, SETH, McWILLIAMS, BARRETT and DOYLE, Circuit Judges.

HOLLOWAY, Circuit Judge not participating.

WILLIAM E. DOYLE, Circuit Judge.

This is an interpleader action brought pursuant to 28 U.S.C. Section 1335, in which one Hazel Bailey has asserted a counterclaim against appellant Liberty Bank, the essence of which is that Liberty Bank conducted sales of property in a commercially unreasonable manner to her injury and damage.

The original controversy commenced in 1966 or 1967. Hazel Bailey at that time had some $20,000 from insurance proceeds,

which had been paid as a result of her husband's death. She had resided in Texas (she later moved back to Texas). At the time in question she had resided with her daughter and son-in-law in Oklahoma City and it was then that she invested the $20,000 in U. S. Treasury bills and did so through the Liberty Bank.

In 1969, Mrs. Bailey's son-in-law and daughter, Michael C. Clark and Jo Ann Bailey Clark, started an oil drilling company called Taurus. In this connection they commenced borrowing from Liberty National Bank, the appellant. In the year 1968 Mrs. Bailey had two outstanding notes which were payable to Liberty National Bank in an amount exceeding $10,000. One of her treasury bills had been pledged as collateral for payment of this. When the bills matured they were cashed and the $20,000 was deposited in Mrs. Bailey's checking account at the Liberty Bank. On that day two promissory notes, which were due and payable, were satisfied from her checking account, as was an obligation in the amount of $908.89, which had accrued in connection with her Bank Americard. There was a remaining balance of $8,308.44, which was used by Mrs. Bailey to purchase a certificate of deposit (C.D.) in the name of her daughter. At the same time, she appropriated an additional $11,000 for the purchase of an additional C.D. This was also loaned to her daughter for use as collateral in connection with the business enterprise.

During the times that the described dealings were occurring the Clarks were indebted to Liberty. According to Mrs. Bailey, the monies which she made available to the Clarks in the form of the C.D.'s were loans and were not gifts. Later the C.D.'s which she had turned over were cashed and the proceeds were applied by Liberty to the Taurus note. Bank officers at that time advised Michael Clark that a $19,000 note ought to be given to Mrs. Bailey to evidence her loans and at that time such a note was given, secured by a security interest in the Taurus drilling rig in which Liberty Bank had been given a prior security interest. A financing statement evidencing this trans-

action between Mrs. Bailey and the Clarks was filed on March 7, 1972, some four months after the note was executed. Needless to say, none of the $19,000 note or interest was ever paid by Taurus to Mrs. Bailey.

As a result of a discussion with one of the Liberty Bank officers, Mr. Clark agreed to surrender the drilling rig to Liberty so that there could be a sale of it and the proceeds could be used to pay the debt of Taurus to Liberty. Accordingly, the rig was surrendered to Liberty in March 1972, and Liberty proceeded to sell it. It had no previous experience in selling an oil rig and so the officers inquired or investigated as to the usual manner of such sales. Liberty was told that the ordinary method for selling a drilling rig was to employ an auctioneer to move the rig to a convenient location to clean and paint it and then notify interested persons and, in addition, advertise the sale in trade journals and newspapers. The bank followed none of these suggestions. Indeed, it sold the rig without any professional help. Notices were sent to 16 creditors, including Taurus, and to some 19 other companies. Mrs. Bailey did not receive notice except information furnished by her son-in-law. The rig was neither cleaned, painted nor dismantled. Liberty did not move it to a convenient site, but sold it at the place where it had been near Perryton, Texas. The sale was conducted by an attorney for Liberty who had never conducted an auction of an oil rig or oil field equipment and who lacked experience in the oil business. The attorney was assisted by a Liberty Bank officer who knew something about oil production, but was not acquainted with the drilling of wells. Some 40 or 50 people appeared for the sale, but few made bids. In fact, after the price reached $37,000, there were only two bidders. The final sale price, $42,000, was sufficient to pay off the Taurus note and pay the expenses of the sale, but left little for the other creditors. The rig had been appraised at $60,000 to $80,000.

The successful bidder was Raymond Hefner of Bonray Oil Company and Miller &

**1378**

Miller Auctioneers. In June 1972, Miller & Miller sold the equipment for $77,705.50.

The district court determined that there had not been .a significant change in the market condition between March 28, 1972, the date of the original sale, and June 6, when the property was resold. Bonray Oil and Miller & Miller realized a net profit of $19,175.56. Based upon its finding that Liberty had not acted in good faith and had been preoccupied with recovering their indebtedness, the district court found for the plaintiff, determining that the equipment had not been sold at the current price in a recognized market nor in the usual manner nor in conformity with reasonable commercial practices among oil field equipment drillers.

1. The court's findings of fact are as follows:

12. That the sale was held on March 28, 1972, at Perryton, Texas, and was conducted by Mr. Jennings, attorney for Liberty Bank, who had never conducted an auction of an oil rig or oil field equipment, and by Mr. Weldon, Vice President of Liberty Bank, who had never conducted an auction. The highest bid obtained was from Bonray Oil Co. for $42,000. The Court finds that Liberty Bank avoided loss only as to themselves and did not make an effective realization from the sale of the rig and related equipment. Miller & Miller Auctioneers had a fifty percent (50%) interest in the purchase and immediately after the purchase for $42,000, representatives of Bonray Oil Co. and Miller & Miller estimated that upon resale at an auction conducted by Miller & Miller, $70,000 could be realized. The Court finds that the equipment was not sold at the current price in a recognized market.

13. The proper way to sell the rig and related equipment would have been to contract with a professional auctioneer, or to follow the same steps and procedures a professional auctioneer follows in disposing of equipment of this type which is to clean and paint the equipment, prepare a brochure and mail it to the proper people; advertise in trade journals, regional newspapers and the *Wall Street Journal*; move the equipment to a convenient location, and offer the equipment on a piece by piece basis as well as in one lot. The Court finds that the rig and related equipment were not sold by Liberty Bank in the usual manner in a recognized market, nor in conformity with reasonable commercial practices among oil field equipment dealers.

After payment satisfying its indebtedness, Liberty filed a suit in interpleader and deposited the remaining sum of $4,065.67 for distribution to the remaining creditors. Mrs. Bailey, in turn, filed a counterclaim seeking damages alleging that she had a security interest in the drilling rig and that the sale was not carried out in a commercially reasonable manner in conformance with the U.C.C., Section 9–504.

The trial court found in favor of Mrs. Bailey and entered judgment in her favor and against Liberty in the amount of $19,000, together with attorney's fees.[1]

On this appeal Liberty raises the following points:

1. That the court lacked jurisdiction to entertain the counterclaim of Mrs. Bailey

14. That on June 6, 1972, Bonray Oil Co. and Miller & Miller sold the same equipment which they purchased from Liberty Bank at a standard auction conducted by Miller & Miller in their customary and usual manner as set forth above and realized the sum of $77,705.50 from that sale.

The court's conclusions are as follows:

3. The conversion of the Certificates of Deposit by Liberty Bank and their application to the indebtedness of Taurus Drilling Corporation was adequate consideration for the $19,000 note and security agreement from Taurus Drilling Corporation in favor of Hazel Bailey; 12A O.S. Section 1–201; and *Petroleum Refractionating Corp. v. Kendrick Oil Co.*, 65 F.2d 997 (10th Cir. 1933).

4. Liberty Bank had a superior security interest in the rig and related equipment sold by them on March 28, 1972, and Hazel Bailey had a junior security interest in the same equipment; 12A O.S. Section 9–204.

5. Liberty Bank failed to sell the rig and related equipment in a commercially reasonable manner; 12A O.S. Section 9–504; *Old Colony Trust Co. v. Penrose Industries Corp.*, 280 F.Supp. 698 (E.D.Pa.1968) aff'd, 398 F.2d 310 (3rd Cir. 1968); *Dynalectron Corp. v. Jack Richards Aircraft Co.*, 337 F.Supp. 659 (W.D.Okl., 1972).

6. Therefore, Hazel Bailey is entitled to judgment against Liberty Bank for her loss as a result of Liberty Bank's failure to sell the rig and related equipment in a commercially reasonable manner. The Court finds Hazel Bailey's loss to be $19,000 plus ten percent (10%) per annum interest from November 1, 1971, plus reasonable attorneys fees; 12A O.S. Section 9–507.

for the reason that under the rule of the Tenth Circuit the interpleader action by its nature precluded the consideration of any issues other than entitlement to the sum deposited.

2. That the evidence was insufficient to support findings of conversion or resulting trust on the part of Liberty.

3. That it was error for the court to determine that Mrs. Bailey had a security interest giving rise to an entitlement to damages under the U.C.C.

Liberty also maintains:

That Mrs. Bailey acquired no interest in the drilling rig; that she had notice of the sale; that she had no right to complain about the sale since she made no effort to restrain it or to redeem the collateral prior to sale; that it acted in good faith and conducted the sale in a commercially reasonable manner.

Finally, Liberty says that even if damages were recoverable there was no basis whatever for award of attorney's fees and it also urges that interest can run only from the date of judgment since the claim was an unliquidated one.

## I.

Liberty contends that the trial court lacked jurisdiction to entertain the counterclaim and to award affirmative relief to Mrs. Bailey and against Liberty. Liberty relies on the proposition that it was a mere disinterested stakeholder. As a result, Mrs. Bailey was not an opposing party within the meaning of Rule 13, Fed.R.Civ.P. Liberty relies on our decisions in *First National Bank in Dodge City v. Johnson County National Bank and Trust Company*, 331 F.2d 325 (10th Cir. 1964); *Erie Bank v. United States District Court for District of Colora-*

*do*, 362 F.2d 539 (10th Cir. 1966); *Knoll v. Socony Mobil Oil Company* 369 F.2d 425 (10th Cir. 1966).

In *First National Bank*, a claimant in an interpleader action sought leave of the trial court to file a counterclaim against a stakeholder which, as in the case at bar, had not asserted a claim to the fund which had been interpleaded. The trial court denied leave to file the counterclaim and the claimant appealed. This court held that the trial court's order was not appealable and, therefore, the Court of Appeals had no jurisdiction. Nevertheless, by way of dictum the court said that assuming the order was appealable, a disinterested stakeholder does not have the status of an opposing party within the meaning of Rule 13 and, therefore, the trial court did not have jurisdiction to entertain the counterclaim. From this beginning the present rule has developed.

Thus, in *Erie Bank* this court held that an interpleader claimant cannot file and maintain a counterclaim against a disinterested stakeholder. The bank had moved unsuccessfully to compel a dismissal of the counterclaim in the district court.

Similarly, in *Knoll*, we held that the trial court lacked jurisdiction to hear a counterclaim against a disinterested stakeholder. We followed *First National Bank* and *Erie Bank* and held that the trial court was without jurisdiction to hear a counterclaim against a disinterested stakeholder. The counterclaim, however, in *Knoll* was based on a transaction which was distinct and independent from that which gave rise to the interpleader action. In contrast, the counterclaim at bar arises out of the identical transaction which underlies the interpleader action, that is, the auction sale of the oil rig and hence it is compulsory under Rule 13(a), Fed.R.Civ.P.[2]

2. Rule 13(a) provides as follows:

(a) Compulsory Counterclaims. A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.

But the pleader need not state the claim if (1) at the time the action was commenced the claim was the subject of another pending action, or (2) the opposing party brought suit upon his claim by attachment or other process by which the court did not acquire jurisdiction to render a personal judgment on that claim, and the pleader is not stating any counterclaim under this Rule 13.

In *Pipeliners Local Union No. 798 v. Ellerd*, 503 F.2d 1193 (10th Cir. 1974), the "logical relation" test between the claim and the counterclaim was applied in determining whether the counterclaim arises out of the transaction or occurrence. That is the subject matter of the opposing party's claim. In our case there is a logical relation between the interpleader action and the counterclaim since both originate in the sale of the collateral.

The interpleader action is equitable in its origin and being equitable its object was never to exclude contention, particularly that growing out of the same transaction and occurrence. To employ it in the manner in which Liberty proposes would be highly inequitable in that it would freeze out potential claims. Also, it would be contrary to general law and out of harmony with the rules of civil procedure.

Mrs. Bailey's counterclaim is compulsory. She is exposed to the hazard of losing it altogether if it cannot be maintained in the interpleader action. If, of course, the counterclaim is held to be jurisdictionally impermissible, she might not lose it and yet it is so potentially confusing that she could very well be deprived of it in subsequent litigation in another court, for the judge in the other court might take the position that it had to have been asserted and tried in the other litigation.

Professor Moore comments in some depth and adopts the position that an interpleader action can be used to resolve the title claim among claimants in a disputed matter but, in addition, can be used to settle disputes between the claimants and the stakeholder.

3A J. Moore, Federal Practice Paragraph 22.15. An allegation that the stakeholder is liable to one or more of the claimants may be raised in the form of a counterclaim.[3] All of the cases except those in our Circuit follow this view. *See Provident Mutual Life Insurance Co. of Phila. v. Ehrlich*, 374 F.Supp. 1134 (E.D.Pa.1973), aff'd in part and rev'd in part on other grounds, 508 F.2d 129 (3d Cir. 1975); *Phillips Petroleum Company v. Riverview Gas Compression Company,* 372 F.Supp. 282 (N.D.Tex.1972); *Bell v. Nutmeg Airways Corporation,* 66 F.R.D. 1 (D.Conn.1975); *United Benefit Life Ins. Co. v. Katz,* 155 F.Supp. 391 (E.D.Pa.1957) (semble).

Nothing in Rule 13 bars the maintaining of a compulsory counterclaim in interpleader actions. *See* 7 Wright & Miller, Section 1715. The authors say that the Tenth Circuit stands alone in interpreting Rule 13(a), as applied to interpleader actions, too restrictively. Nor do policy considerations argue against allowing compulsory counterclaims in interpleader actions. The same considerations that favor the interposition of compulsory counterclaims in other actions are present in interpleader actions such as in the case before us.[4] Hence, there is no good reason for disallowing the counterclaim where, as here, a party has a compulsory one. As Wright and Miller say, where a stakeholder has initiated the action it is reasonable to conclude that he has opened himself up to counterclaims. *See* Wright & Miller, *supra,* Section 1715.

An alternative approach to the solution of this problem was employed by this court in *Miller & Miller Auctioneers, Inc. v. G. W. Murphy Indus., Inc.,* 472 F.2d 893 (10th Cir.

**3.** Both Professor Moore and Wright & Miller point out that the deposit of the funds with the court and the stakeholder's request for discharge from liability and for judicial protection against further claims by the claimants creates the adversity necessary to satisfy the "opposing party" requirement of Rule 13. 3A J. Moore, Federal Practice Par. 22.15, p. 3130, n. 6; 7 Wright & Miller, Federal Practice & Procedure: Civil Section 1715, p. 448. *See also Bell v. Nutmeg Airways Corporation,* 66 F.R.D. 1 (D.Conn.1975); *Phillips Petroleum Company v.*

*Riverview Gas Compression Company,* 372 F.Supp. 282 (N.D.Tex.1972). Neither case has yet been reviewed on appeal.

**4.** *Southern Construction Co., Inc. v. Pickard,* 371 U.S. 57, 83 S.Ct. 108, 9 L.Ed.2d 31 (1962) (purpose of the rule is to prevent multiplicity of actions and to achieve resolution in a single lawsuit of all disputes arising out of common matters); *Thomas v. Malco Refineries,* 214 F.2d 884 (10th Cir. 1954).

1973). There an auction company ·interpleaded some of the proceeds of a sale of oil drilling equipment, but not until it had first satisfied its own claims for fees in selling the equipment and paid off a number of secured creditors. A number of claimants were in line for the balance of the funds. The United States intervened, asserting two tax claims. This court was dissatisfied with the manner of using the funds, expressing its view that it should have all been paid into court rather than Miller & Miller using the fund to pay itself off and to pay other preferred claims. On that account the court said that it was not a true interpleader and it should not have been allowed to proceed as one. It then held that the government, having an independent source of jurisdiction, could proceed with its counterclaims. At bar we have the same situation in that Liberty paid off itself and gave the other claimants what was left and sought to foreclose all lawsuits against itself. Also, here there is a possible independent source of jurisdiction on the basis of diversity. Were we to hold to the old rule, however, and adopt this way around the *Erie* case and the *Socony* decision, the situation would continue to be a confused one. In our view the rule of the Tenth Circuit which stands alone, and which has little to recommend it, ought to be modified, at least to the extent that it recognizes that a compulsory counterclaim can be raised against the stakeholder in an interpleader action. As noted above, equity, law and procedure dictate such a result.

Accordingly, it is our conclusion that the trial court had jurisdiction to entertain the compulsory counterclaim. It had jurisdiction as well to award damages. ·

To the extent that this holding runs counter to our decisions in *First National Bank, Erie Bank* and in *Knoll,* that is to the extent that these decisions deny the interposing of a compulsory counterclaim in an interpleader action, they must give way so that they will no longer stand for the exclusion of the compulsory counterclaim.

II.

Liberty contends:

■ That Mrs. Bailey failed to prove that she suffered injury compensable under the UCC;

That it carried out the sale of the oil rig in a commercially reasonable manner in accordance with the requirements of the UCC;

That following default and possession of the collateral, the sale was carried out in good faith and within the requirements of Section 1–203 of the UCC, 12A O.S.A. 1–203 and in a commercially reasonable manner as required by Section 9–504, 12A O.S.A. 9–504.

The trial court found and concluded to the contrary. In its detailed ruling the court focused on failure of Liberty to advertise the sale, including its failure to advertise in trade and commercial journals. Liberty, according to further findings, made no preparation for the sale: it did not dismantle the rig, failed to clean up its parts and to paint it. It did not move it to a location which would lend itself to a sale. It did not employ a professional auction company. Instead it used an attorney from the bank, who was inexperienced in auction sales. Thus, it made no real effort to obtain the maximum amount. The court ruled that Liberty's failure to observe minimal standards followed in the trade constituted a failure to sell in the "usual manner in a recognized market, nor in conformity with reasonable commercial practices among oil field equipment dealers."

The court considered the ultimate sale by the purchasers for $77,705.50 as some measure of the true value of the equipment. It concluded:

"Liberty Bank failed to sell the rig and related equipment in a commercially reasonable manner; 12A O.S. Section 9–504; *Old Colony Trust Co. v. Penrose Industries Corp.,* 280 F.Supp. 698 (E.D.Pa.1968), aff'd, 398 F.2d 310 (3d Cir. 1968); *Dynalectron Corp. v. Jack Richards Aircraft Co.,* 337 F.Supp. 659 (W.D.Okl.1972)."

■ Liberty tries to equate commercially reasonable with dishonesty. While dishonesty would also constitute unreasonableness, we do not consider it essential. These two terms can scarcely be regarded as interchangeable. Reasonableness calls for utilization of recognized methods as they are practiced in the particular trade.[5] The customs that are here applicable were not employed and the fact that Liberty weighed the situation and made a decision not to follow them does not help its situation. The statute imposes the commercially reasonable standard to both the preparation for the sale and the actual sale. *See* 12A O.S.A. Sections 9–504(1) and 9–504(3). The latter provision states:

> Disposition of the collateral may be by public or private proceedings. * * * Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable.

It is true that the sale may be as a unit or in parcels, but circumstances are capable of requiring that it proceed in one way or the other. The trial court found that it was not commercially reasonable in this instance to proceed to sell it as one unit. Also, the sale was conducted in a snow storm in an inconvenient place using methods not designed to produce the best results. The trial court's findings are supported by the evidence. Also, Liberty was fully aware of the interests of Mrs. Bailey and, in turn, the Clarks. Being aware of Mrs. Bailey's particular problems it was called upon to act reasonably in light of her interests. The requirement of the Act that the sale be conducted in a commercially reasonable manner has in mind the interest of a third person such as Mrs. Bailey.

Liberty's argument that Mrs. Bailey did not have a proper security interest is without merit. After all, she put her money in the Taurus enterprise and Taurus and the bank gained from it. It cannot be said that

a preexisting claim is not valued. *See* 12A O.S.A. 1–201(44)(b). Liberty would have us reexamine the facts and independently find that it acted reasonably. This we cannot do. The findings of the court are supported by the evidence.

### III.

■ An alternative basis for the trial court's decision was that Liberty converted Mrs. Bailey's interest. Finding 2 says that when Liberty Bank suggested the C.D.'s be purchased with Mrs. Bailey's treasury bill proceeds, this constituted a conversion or a resulting trust. From our examination of the record, it is our view that this finding is contrary to the evidence. Hazel Bailey consented to the use by Jo Ann Bailey Clark and her husband, Michael Clark, of the funds in question. Her testimony is clear that she consented to the employment of the funds in the oil enterprise. ' We are unable to uphold this conversion or resulting trust theory. In our judgment the cause must stand or fall on the basis of whether the sale was carried out in a commercially reasonable manner, and we affirm on this latter basis only. We also disagree with the award of a lawyer's fee in the amount of $3,000. This is not supported by the Code or by contract. *E. g., Simpson v. Butts,* 99 Okl. 168, 226 P. 332 (1924). An effort is made to uphold the award of the attorney's fees on the ground that the action was one in interpleader. However, the award of an attorney's fee in an interpleader action has in mind the performance of services in connection with the preservation of the funds. In our view it is inappropriate to allow the lawyer's fee in this case, arising as it does from counterclaim and which is based on the failure to carry out the sale in a commercially reasonable manner. Since we are not dealing with interpleader funds here but rather are dealing with a breach of duty on the part of the bank which occasioned damages, we fail to see that attorney's fees are appropriate.

---

5. The comments to Section 9–504 of the Oklahoma Uniform Commercial Code, 12A O.S.A. 9–504 (Comment (3)), recognize that the practices of the trade or market are to be considered.

Accordingly, the judgment of the district court is affirmed except as to the award of the attorney's fees. The cause is remanded for the purpose of eliminating the attorney's fee award from the judgment.

## ON PETITION FOR REHEARING

■ Appellant has moved for a rehearing on a single point, namely the failure of the court to consider the trial court's judgment awarding interest to the defendant-appellee starting November 1, 1971. We have ordered a response and have fully considered both the motion and the appellee's response to it.

Our attention has been directed to the fact that in the opinion we specifically mentioned that Liberty had asserted that the trial court erred in awarding interest on November 1, 1971. We did indeed overlook this issue and we now consider it.

The statute, 23 Okla.Stat. Section 6 provides:

### Interest upon damages

Any person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt. R.L.1910, § 2848.

Thus it contemplates the award of interest on sums which are certain or liquidated. The Oklahoma Supreme Court has held on several occasions that interest cannot be awarded on an unliquidated claim where a trial is necessary in order to determine the amount that is due. *Smith v. Owens,* 397 P.2d 673 (Okl.1963); *Allison v. Allen,* 326 P.2d 1059 (1958); *Lumbermen's Supply Co. v. Neal,* 189 Okl. 544, 119 P.2d 1017 (1941). *See also American Eagle Fire Ins. Co. v. Lively,* 142 Okl. 246, 286 P. 797, 798 (1930).

The amount that Mrs. Bailey was entitled to recover was not certain prior to the trial and the award. True, she claimed this amount, but if the court had granted her less it would have not have had to have been modified. This was, after all, in the nature of a tort injury in which the allega-

tion was negligent conduct of the sale on the part of the bank. The extent of Mrs. Bailey's injury and loss at the hands of the bank was subject to determination by the trial court. It depended upon the reasonable market value of the property that was sold. Until the court determined the amount of this damage it was uncertain and was not subject to being made certain by any mathematical process.

Thus, we conclude that the validity of her claim and the actual amount of her loss was not determined until the issues were tried. As a result, her claim was unliquidated and her entitlement to damages did not arise until the date of judgment at which time her claim became certain. This was April 30, 1975.

On remand, therefore, the trial court is directed to make an adjustment in accordance with this ruling.