**NATIONAL HOUSING PARTNERSHIP, Appellant/Cross–Appellee**

v.

**MUNICIPAL CAPITAL APPRECIATION PARTNERS I, L.P., Appellee/Cross–Appellant.**

Nos. 03–CV–1080, 03–CV–1253, 05–CV–32 and 05–CV–62.

District of Columbia Court of Appeals.

Argued Sept. 1, 2005.
Decided Nov. 1, 2007.

---

John Moustakas, Washington, DC, with whom Martin J. Flynn and Eric A. Baker, were on the brief, for appellant/cross-appellee.

Gordon A. Coffee, with whom Anne W. Stukes and Richard A. Hibey, Washington, DC, were on the brief, for appellee/cross-appellant.

Before RUIZ, REID and GLICKMAN, Associate Judges.

GLICKMAN, Associate Judge:

These appeals, arising under Maryland law, require us to delve into the meaning of an agreement furnishing security for the payment of a promissory note and the requirements of former Article 9, the Secured Transactions Article, of the Uniform Commercial Code. The parties' disputes began when National Housing Partnership ("NHP") defaulted on a $3.2 million note payment, leading Municipal Capital Appreciation Partners I, L.P. ("MCAP") to foreclose on the collateral and acquire it for $1.4 million. In the ensuing litigation, NHP was held liable for the entire amount of the deficiency and for MCAP's attorneys' fees and costs. We now reverse that judgment and remand for further proceedings.

1. *See* 42 U.S.C. §§ 3933, 3937.

## I.

NHP is a District of Columbia partnership that was established at the direction of Congress to foster private investment in low and moderate income housing.[1] NHP acquired and managed affordable multi-family housing projects through limited partnerships, in which it served as the general partner.

In August 1984, NHP entered into a Purchase Agreement with Laurel Kimberly Associates to acquire Kimberly Gardens, a 172-unit housing project in Laurel, Maryland. As part of the purchase price, NHP agreed to furnish the seller a secured, long-term note in the amount of $1,401,600, under which all payments of principal and interest at the rate of nine percent per annum would be deferred until the end of the term. The term of this deferred note was ten years, with the purchaser having the option to extend the maturity date by five years. NHP also agreed to an initial cash payment of $230,000; a three-year installment note for $409,000; and the assumption by the purchaser of an existing low-interest mortgage that was insured by the United States Department of Housing and Urban Development ("HUD"). The original principal amount of the HUD mortgage was $2,708,800.

Prior to the closing, NHP assigned its rights, title and interest under the Purchase Agreement to Kimberly Associates Limited Partnership ("KALP"), a Maryland single-asset real estate limited partnership formed for the purpose of owning and managing Kimberly Gardens. NHP was the general partner and one of two limited partners of KALP. Thereafter, on December 13, 1984, KALP signed and furnished the seller a $1.4 million Acquisition Note ("Note") and the other documents

necessary to complete the purchase. The Security Agreement, executed by NHP, provided that in the event of default, the seller would be entitled to foreclose on NHP's partnership interests in KALP, its rights with respect to KALP, and all monies owed to NHP by KALP, in order to satisfy the outstanding debt.

Following its acquisition by KALP, Kimberly Gardens was renamed Cherry Branch Townhomes ("Cherry Branch"). In 1993, KALP exercised its option to extend the maturity date of the Note by five years, to December 13, 1999.

In late 1997 or early 1998, roughly two years before the Note's maturity date, MCAP paid $1.9 million in cash to acquire the Note from Laurel Kimberly Associates, together with all rights of the secured party under the Security Agreement. A year or so later, NHP was acquired by AIMCO, a real estate investment trust that was one of the country's largest owners and operators of affordable multifamily housing, with approximately 1,600 properties in forty-seven states.

The price that MCAP paid for the Note was heavily discounted. When the Note came due on December 13, 1999, KALP owed $3,293,760 in deferred principal and interest. As MCAP may have foreseen, NHP preferred to lose Cherry Branch (KALP's sole asset) rather than pay off the Note. In deciding to cause KALP to default on the Note payment, NHP understood that the Note was nonrecourse, so that if the forfeited collateral (*i.e.*, NHP's interests in KALP) was worth less than the debt, NHP would not be liable to MCAP for the difference.

As NHP anticipated, MCAP elected to enforce its security interest. On January 3, 2000, MCAP sent NHP a formal notice of foreclosure on the collateral. The notification stated that MCAP would sell NHP's partnership interests in KALP at a public auction on January 25, 2000 and enclosed the advertisement for the foreclosure sale that MCAP would place in the Official Notices section of *The Washington Post* on January 4, 11, and 18, 2000. These advertisements ran as planned and elicited three telephone inquiries from persons expressing interest in the sale. MCAP responded to these inquiries by providing additional information to the callers.

NHP raised no objection to the foreclosure arrangements, the notification it received, or the advertisements in *The Washington Post*. However, NHP found itself in a dispute with MCAP over whether the foreclosure would wipe out NHP's right to be repaid approximately $3 million on account of outstanding partnership loans that it had extended to KALP. To preserve its rights as a creditor of KALP, NHP sued MCAP in the Superior Court of the District of Columbia on January 24, 2000, the day before the foreclosure sale was to be held. The complaint sought, *inter alia*, a judicial declaration that the Note was nonrecourse and that NHP's loans would survive the foreclosure as valid, continuing debts of KALP.

Because of a snowstorm on January 25, and with NHP's agreement, MCAP adjourned the public foreclosure sale to February 2, 2000. MCAP advertised the postponement in the Public Sale Notices section of *The Washington Post* on January 29. NHP did not object to this advertisement or seek to enjoin the foreclosure sale.

On February 2, the foreclosure sale of NHP's interests in KALP went ahead at the District of Columbia offices of MCAP's legal counsel. NHP's representatives attended the auction but did not bid on the collateral securing the Note. MCAP was the only bidder and purchased the collater-

al for $1,411,385.60. According to MCAP, its bid was discounted to reflect the fact that NHP's lawsuit had created a $3 million cloud against the collateral. As the deferred principal and interest had risen by February 2 to $3,332,928, a deficiency of $1,921,542.40 remained. MCAP asserted that, under the terms of the Security Agreement, NHP was liable for this deficiency, and on February 24, 2000, MCAP made a formal, written demand on NHP for its payment. Disagreeing with that position, NHP refused MCAP's demand.

In the ensuing months, NHP twice amended its complaint in Superior Court, eventually seeking a declaratory judgment (1) that it had no personal liability for any deficiency due on the Note after application of the foreclosure sale proceeds, and (2) that its loans to KALP were valid obligations not extinguished by the foreclosure and inherited by MCAP.[2] Count III of NHP's Second Amended Complaint alleged that, by virtue of MCAP's failure to repay NHP's loans, the foreclosure sale had resulted in a *de facto* surplus, rather than a deficiency, to which NHP was entitled. MCAP answered NHP's complaints and counterclaimed for a deficiency judgment. MCAP's counterclaim also sought damages from NHP for mismanagement of KALP and waste of the Cherry Branch property.

The parties eventually filed cross motions for summary judgment. On March 29, 2002, the motions judge granted partial summary judgment on the recourse and loan claims to MCAP. The decision turned on the proper construction of the Security Agreement. On the recourse claim, the judge ruled that the Security Agreement unambiguously rendered NHP personally liable for any deficiency resulting from the foreclosure sale. Whether the foreclosure sale had been conducted in a commercially reasonable manner, as legally required, and the amount of any recoverable deficiency, were factual issues that remained to be resolved at trial. On NHP's loan claim, the judge ruled that the definition of "collateral" in the Security Agreement encompassed NHP's right to repayment of its loans to KALP, and that the loans were extinguished by MCAP's foreclosure. As a corollary, the judge awarded summary judgment to MCAP on Count III of NHP's Second Amended Complaint, which asserted that MCAP's failure to repay the loans had resulted in a surplus rather than a deficiency after the foreclosure sale.[3]

After this summary judgment decision, the case was reassigned to a different judge for trial. Several months prior to trial, NHP moved for leave to amend its reply to MCAP's counterclaim in order to assert its own compulsory counterclaim. Citing appraisals that had valued the Cherry Branch property owned by KALP at $8.8 to $8.9 million, NHP's counterclaim alleged that but for MCAP's failure to market the collateral in a commercially reasonable manner, the proceeds from the foreclosure sale would have exceeded the amount of the indebtedness and yielded a surplus to which NHP would have been entitled. In opposition to the motion, MCAP argued that the belatedly proffered counterclaim duplicated Count III of NHP's Second Amended Complaint, on which MCAP had been granted summary judgment. Persuaded by MCAP, the trial

---

2. Upon acquiring NHP's interests in KALP, MCAP replaced NHP as KALP's general partner and thereby became potentially liable for the limited partnership's debts, including any surviving obligations to repay NHP's loans.

3. Regarding MCAP's counterclaims for mismanagement and waste, the judge dismissed the former and left the latter to be resolved at trial. These rulings have not been challenged on appeal.

judge denied NHP leave to amend its reply.

A bench trial of the remaining issues took place in January 2003. The testimony centered on two issues: (1) whether MCAP had conducted the foreclosure sale in a commercially reasonable manner, and (2) whether NHP had committed waste of the Cherry Branch property. On August 15, 2003, the judge issued her decision. On the first issue, the judge rejected NHP's claim that MCAP had publicized the foreclosure sale inadequately and should have sold the collateral privately rather than at a public auction. Rather, the judge observed that a public sale of the partnership interests in KALP was consistent with the Maryland Uniform Commercial Code and the terms of the Security Agreement; the sale was publicized in *The Washington Post* four times; and NHP was given an advance copy of the notice. "There is *no evidence* in this case," the judge found, "that a different type of notice, or private sale, is the accepted practice in the sale of partnership interests in real property." (Emphasis added.) Accordingly, the judge upheld the commercial reasonableness of the foreclosure sale and ordered NHP to pay MCAP the entire $1.9 million deficiency, plus interest from the date of foreclosure and reasonable attorneys' fees. On the second issue, the judge found that NHP had not committed waste at Cherry Branch and, accordingly, denied MCAP's damages claim.

NHP noted a timely appeal from the trial court's rulings. MCAP did not cross-appeal.

Following the trial judge's ruling on the merits, disputes arose between the parties over the rate of interest on the deficiency judgment and the amount of the attorneys' fees. Eventually, on December 10, 2004, the judge ordered NHP to pay interest on the deficiency judgment from February 2, 2000, at the rate of twenty percent per annum (which was the "default rate" specified in the Security Agreement). The judge ruled that NHP also was liable for $1,063,547.72 in attorneys' fees and costs claimed by MCAP pursuant to the Security Agreement, but not for any interest thereon. Both NHP and MCAP appealed the judge's rulings on these issues.

## II.

NHP seeks reversal on several grounds. NHP challenges the two summary judgment rulings that, under the Security Agreement, (1) NHP was liable for any deficiency amount on the Note after the foreclosure sale, and (2) its loans to KALP were extinguished by the foreclosure sale. NHP argues that summary judgment was inappropriate in both instances because the Security Agreement was ambiguous and thus had to be construed in light of extrinsic evidence (necessitating a trial).

Additionally, NHP challenges the trial judge's finding that MCAP's disposition of the collateral securing the Note was commercially reasonable. Emphasizing the specialized nature of the collateral—interests in a limited partnership owning a HUD-regulated multifamily housing project—NHP contends that it was commercially *unreasonable* for MCAP (1) to sell the collateral at a public auction instead of through private channels, and (2) to publicize the sale only by means of classified advertisements in a general circulation newspaper such as *The Washington Post.*

NHP further contends that the trial judge erred in denying its motion for leave to assert a compulsory counterclaim for the surplus that should have been generated from the foreclosure sale, because the motions judge had not disposed of that claim on summary judgment. Finally,

NHP also asserts that the trial judge erred by denying discovery with regard to MCAP's claimed attorneys' fees and by assessing interest on the deficiency judgment at the rate of twenty percent.

In its cross-appeal, MCAP only challenges the denial of interest on its attorneys' fees award.

We conclude that summary judgment was improvidently granted with respect to NHP's liability for the deficiency, but we uphold the award of summary judgment with respect to the extinguishment of NHP's loans to KALP. In addition, we direct the trial court to reconsider its determination that the foreclosure sale was commercially reasonable. Also, we hold that the grant of summary judgment on Count III of NHP's Second Amended Complaint did not bar NHP from belatedly asserting its compulsory counterclaim for the hypothetical surplus that would have been produced by a proper disposition of the collateral. In view of the further proceedings in the trial court that our decisions will require, we decline at this time to reach the issues concerning interest and MCAP's attorneys' fees.

## A. The Grant of Summary Judgment to MCAP on NHP's Claims

Our review of an award of summary judgment is *de novo*.[4] Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Super. Ct. Civ. R. 56(c). The evidence is to be viewed in the light most favorable to the non-moving party.[5] A contract interpretation case, such as the present contest over the meaning of the Security Agreement, may be resolved by summary judgment if the contract is reasonably susceptible to only one reading under the governing law.[6] But summary judgment generally will not be appropriate if the contract is ambiguous and its interpretation "depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence."[7] Whether a contract is ambiguous is a question of law.[8]

The Security Agreement provides that it "shall be governed in all respects by the laws of the State of Maryland." Under Maryland law, we have explained,

contracts should be interpreted to effectuate the intentions of the parties by considering "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." *Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 488 A.2d 486, 488 (Md.1985); *Chicago Title Ins. Co. v. Lumbermen's Mut. Cas. Co.*, 120 Md.App. 538, 707 A.2d 913, 917 (Md.App.1998). With this background, the trial judge examines the four corners of the [contract] to determine if it is unambiguous. *See Heat & Power Co. v. Air Prods. & Chemicals, Inc.*, 320 Md. 584, 578 A.2d 1202, 1208 (Md.1990). When a contract is clear and unambiguous, the court should interpret the contract terms as a matter of law, presuming that the parties intended what they expressed. *Chicago Title, supra,* 707 A.2d at 917. If the contract is ambigu-

4. *Washington Props. v. Chin, Inc.*, 760 A.2d 546, 548 (D.C.2000).

5. *Allen v. Yates*, 870 A.2d 39, 44 (D.C.2005).

6. *Holland v. Hannan*, 456 A.2d 807, 815 (D.C. 1983).

7. *Id.*

8. *See id.*

ous, summary judgment is inappropriate as the trier of fact must then resolve the meaning of the contract. *See id.* at 918. In doing so, the trier of fact is free to consider "extrinsic evidence which sheds light on the intentions of the parties at the time of the execution of the contract." *Heat & Power, supra,* 578 A.2d at 1208. "An ambiguity exists when, to a reasonably prudent person, the language used in the contract is susceptible of more than one meaning." *Id.* *Klock v. Miller & Long Co.,* 763 A.2d 1147, 1150–51 (D.C.2000). Thus, the basic principles of Maryland law in this area are identical to those of this jurisdiction.

We therefore turn to consider whether the Security Agreement is unambiguous with respect to (1) NHP's recourse liability for the deficiency owed on the Note after foreclosure on the collateral, and (2) the inclusion of NHP's loans to KALP in the collateral.

### 1. NHP's Recourse Liability

By signing the Security Agreement, NHP granted the Secured Party (*i.e.,* MCAP, by assignment) a security interest in specified collateral to secure the payment of the $1.4 million deferred acquisition note, which is referred to in the Security Agreement as the "Note." In the event of default, Section 6 of the Security Agreement provides that the Secured Party is entitled to sell the collateral and apply the cash proceeds to the principal and interest due on the Note. Two provisions of the Security Agreement address the question of NHP's liability to the Secured Party for any deficiency remaining

after such application. Unfortunately, these two provisions are in conflict.

Section 6 of the Security Agreement states that "the Debtors shall remain liable and will pay [the] Secured Party on demand any deficiency remaining (the 'Deficiency')." [9] The term "Debtors" is defined in the Security Agreement to refer, specifically, to NHP and William D. Comings, Jr., the other limited partner of KALP. In contrast, Section 12 of the Security Agreement states that "[n]either the Partnership [KALP] nor any general or limited partner thereof shall have any personal liability for any Note, the sole recourse of the Secured Party being limited to the Collateral and actions against the Purchasing Partnership and its partners with respect thereto." NHP was both the general partner and a limited partner of KALP. In other words, one section of the Security Agreement states that MCAP shall have recourse to NHP for any deficiency on the Note while another section of the Security Agreement states the opposite, that MCAP shall have no recourse to NHP for any deficiency on the Note.

Thus, Sections 6 and 12 appear to be "completely contradictory," which the Maryland Court of Appeals has called "the grossest form of ambiguity." [10] Depending on which section of the Security Agreement is deemed binding, the contract is susceptible of two completely different meanings.

Maryland's highest court also has said that "where two provisions of a contract are seemingly in conflict, they must, if possible, be construed to effectuate the intention of the parties as collected from

---

9. This obligation is stated to be "subject to and in accordance with terms of Section 11 hereof." Section 11 of the Security Agreement essentially provides that the Secured Party shall not assume any of the Debtors' obligations.

10. *Bailer v. Erie Ins. Exch.,* 344 Md. 515, 687 A.2d 1375, 1380 (1997); *see also ABC Appliance Sales & Serv., Inc. v. Cole,* 83 Md.App. 254, 574 A.2d 314, 317 (Ct.Spec.App.1990) ("Herein lies the ambiguity; the two provisions are in conflict.").

the whole instrument, the subject matter of the agreement, the circumstances surrounding its execution, and its purpose and design. And, if a reconciliation can be effected by a reasonable interpretation, such interpretation should be given to the apparently repugnant provisions, rather than nullify any." [11] To that end, one rule of construction provides that "[w]here two clauses or parts of a written agreement are apparently in conflict, and one is general in character and the other is specific, the specific stipulation will take precedence over the general, and control it." [12] Invoking these principles, MCAP argues that Sections 6 and 12 of the Security Agreement are reconcilable without resort to extrinsic evidence. According to MCAP, the two provisions are compatible because they address different liabilities: Section 12 states that NHP *is not* liable for the *Note,* while Section 6 states that NHP *is* liable for the *deficiency.*

In our view, MCAP's proposed reconciliation of Sections 6 and 12 is not tenable. Conceptually, the Note and the deficiency are not different liabilities, because the deficiency *is* the amount remaining due on the Note after the sale of the collateral. Thus, it is inconsistent to say that NHP is not liable for the Note but liable for the deficiency, and the purported distinction does not truly resolve the conflict between the two Sections of the Security Agreement. Moreover, as a textual matter, MCAP's proposed interpretation is incompatible with both Section 6 and Section 12. Section 6 states that NHP "shall remain liable" after the sale of the collateral, implying that NHP *was* liable under the Note prior to the foreclosure. And Section 12 states that the Secured Party's "sole recourse" upon default is "limited to the Collateral and actions against the Pur-

chasing Partnership and its partners with respect thereto," meaning that NHP is *not* liable for the deficiency.

In granting summary judgment to MCAP, the motions judge attempted to harmonize Sections 6 and 12 by a different route. He viewed Section 12 as merely stating a "general proposition" that NHP is not liable for "any" note, and Section 6 as creating a specific (yet otherwise unacknowledged and unexplained) "exception" to that proposition solely for the $1.4 million Acquisition Note. But this attempted reconciliation of the two Sections, which seems to us to be rather contrived and implausible, misconstrues Section 12 in a critical respect. The Security Agreement states that the capitalized word "Note," which is used throughout the instrument, refers specifically to the Acquisition Note, which is the only note covered by the Agreement. The term "any Note" in Section 12 thus can mean only the Acquisition Note, not "notes generally" as the judge inferred. Therefore, we do not think it reasonable to attach significance to the use of the word "any" instead of the word "the" in referring to the Note in Section 12. Certainly the mere use of the word "any" cannot be said to resolve the conflict between Sections 6 and 12 as a matter of law.

We perceive no way to reconcile those two contradictory Sections through mere interpretation, without resorting to extrinsic evidence. The Security Agreement is ambiguous and cannot be construed as a matter of law to impose liability on NHP for the deficiency on the Note. On this issue, summary judgment was granted improvidently, and the case must be remanded for a trier of fact to determine what the

---

11. *Chew v. De Vries,* 240 Md. 216, 213 A.2d 742, 744–45 (1965) (citations omitted).

12. *Federal Ins. Co. v. Allstate Ins. Co.,* 275 Md. 460, 341 A.2d 399, 407 (1975).

parties to the Security Agreement intended.

### 2. NHP's Loans to KALP

■ Whether the foreclosure extinguished NHP's right to repayment of its loans to KALP is an issue that turns on the definition of the collateral contained in the Security Agreement. We agree with the motions judge that the definition unambiguously encompasses NHP's loans.[13]

The Security Agreement grants a security interest in the "Collateral," which Section 2 defines in pertinent part as follows:

(a) all right, title and interest of the Debtors in and to the Partnership [KALP]. . . .

(b) all present and future payments, proceeds, compensation, property, assets, interests and rights (including, without limitation, rights of the Debtors to manage and control the Partnership), and all monies due or becoming due and payable to the Debtors in connection with the Partnership;

(c) any interest the Debtors may now or hereafter have as a general or limited partner in the Partnership; and

(d) all proceeds of and distributions from the Collateral described in the foregoing paragraphs (a), (b) and (c) (including but not limited to all proceeds of dissolution or liquidation), together with any and all monies, securities, drafts, notes, items and other property and the proceeds thereof, constituting any such proceeds or distributions, except that the Debtors can use such proceeds or distributions as long as the Note is not in default.

This is a broad definition. At the very least, giving the words of subsection (b) their ordinary meaning,[14] "all present and future payments, proceeds, . . . and all monies due or becoming due and payable to the Debtors in connection with the Partnership" encompasses payments to the Debtors in connection with their loans to the Partnership. "In this regard, the word 'all' must be considered in its usual signification" absent strong reason to do otherwise.[15]

Nonetheless, NHP argues that the definition of "Collateral" is ambiguous because subsection (b) can be read to apply only to payments to the Debtors in their capacity as partners in KALP, and not to payments due them as lenders to KALP. We disagree; the term "in connection with" is not so limited. Moreover, NHP's reading would threaten to render subsection (b) superfluous, inasmuch as payments to which the Debtors are entitled as partners appear to be covered by the other subsections. NHP points to the subtitle of the Security Agreement, "Assignment of Interests in Limited Partnership," but as MCAP rejoins, "[t]he subtitle proves nothing; creditor interests are just as assignable as partner interests."[16]

There is also no merit in NHP's argument that an ambiguity exists because an exhibit to the Purchase Agreement committed NHP only to assign its partnership interests in KALP to secure payment of the Note. The one-page exhibit merely listed six "items to be included" in the yet-to-

---

**13.** We find it unnecessary to reach MCAP's alternative contention that the funds contributed by NHP to KALP were not loans at all, but, rather, were capital infusions. Furthermore, NHP does not dispute that MCAP was entitled to summary judgment on Count III of the Second Amended Complaint, if its loans were part of the collateral.

**14.** *See Kasten Constr. Co. v. Rod Enters., Inc.,* 268 Md. 318, 301 A.2d 12, 18 (1973).

**15.** *Id.*

**16.** Brief of Appellee at 11.

be-drafted Security Agreement; the listing did not purport to be exclusive, and by including NHP's partnership interests, it did not preclude the parties from including other interests in the collateral securing the Note.

We affirm the award of summary judgment to MCAP declaring that NHP's loans to KALP were extinguished in the foreclosure sale of the collateral.

### B. Commercial Reasonableness of the Foreclosure Sale

#### 1. The Standard of Commercial Reasonableness

■ By the parties' agreement, MCAP's disposition of the collateral securing payment of the Note was governed by Maryland law, and specifically by applicable provisions in Part 5 of former Article 9 of Maryland's Uniform Commercial Code.[17] Former Section 9–504(3) of the UCC re-

quired "every aspect" of that disposition, "including the method, manner, time, place and terms," to be "commercially reasonable." [18] The statute thus imposed a commercial reasonableness standard on "both the preparation for the sale and the actual sale." [19] This requirement was reiterated in the Security Agreement that NHP signed.[20]

■ Simply put, "[t]he purpose of requiring commercial reasonableness in the disposition of the collateral is to protect the debtor from a large deficiency judgment and to avoid the waste of a possible surplus." [21] In conjunction with the general duty of good faith, which means honesty in fact,[22] the commercial reasonableness requirement obliges the creditor to "act as a fiduciary and make sincere effort to obtain the full market value of the property." [23]

---

17. *See* Former MD.CODE ANN., Com. Law § 9–501 *et seq.* Revised Article 9 took effect July 1, 2001, after the foreclosure. *See* MD.CODE ANN., Com. Law § 9–701(a) (2007). Where not otherwise indicated, references in this opinion are to the provisions of former Article 9.

18. The "commercial reasonableness" requirement has been carried forward in Part 6 of Revised Article 9. *See* MD.CODE ANN., Com. Law § 9–610(b) (2007).

19. *Liberty Nat'l Bank & Trust Co. v. Acme Tool Div. of Rucker Co.,* 540 F.2d 1375, 1382 (10th Cir.1976).

20. In pertinent part, Section 6 of the Security Agreement provides that in the event of a default, the

"Secured Party shall have the following rights and remedies (to the extent permitted by applicable law) in addition to all rights and remedies of a secured party under the UCC ...: Secured Party may at any time and from time to time *and in a commercially reasonable manner,* sell, resell, assign and deliver, grant options for or otherwise dispose of any or all of the Collateral at public

or private sale or by legal proceedings or otherwise, by one or more contracts, in one or more parts, at the same or different times, for cash and/or credit, and upon any terms, at such places and times and to such persons or entities as Secured Party deems best...."

(Emphasis added.) It should be noted that the foregoing provision may not be construed to waive or vary the obligations subsumed within the statutory "commercial reasonableness" requirement. *See* (former) MD.CODE ANN., Com. Law § 9–501(3)(b).

21. 10 ANDERSON, *Uniform Commercial Code* § 9–504:202 (3d ed. 1999) (footnote omitted) (hereinafter, "ANDERSON").

22. *See* MD.CODE ANN., Com. Law § 1–203 (2007). "Good faith" means "honesty in fact in the conduct or transaction concerned." *Id.,* § 1–201(19). (As used in Revised Article 9, the term "good faith" has been defined to mean "honesty in fact and the observance of reasonable commercial standards of fair dealing." *Id.,* § 9–102(43).)

23. ANDERSON, § 9–504:203 (footnote omitted).

A secured creditor's obligation to make a commercially reasonable disposition of the collateral is a matter fraught with consequence. When a foreclosure sale complies with statutory requirements, "the sale price will be considered to be the true value of the collateral and any deficiency will be awarded automatically to the creditor" (unless the debt is nonrecourse or the parties have provided otherwise).[24] However, if the secured creditor fails to dispose of the collateral in a commercially reasonable manner, then the debtor "has a right to recover from the secured party any loss caused by" that failure.[25] Moreover, in any action governed by Maryland law to recover for a deficiency, the debtor will be entitled to "a rebuttable presumption that the value of the collateral was equal to the debt"—*i.e.*, a presumption that no deficiency remains.[26] These rules mean that a secured creditor who has not conducted a commercially reasonable sale will be able to recover a deficiency judgment only by overcoming the presumption and affirmatively proving that the fair market value of the collateral was less than the amount of the debt. A debtor who establishes that a commercially reasonable sale should have resulted in a surplus will be entitled to recover the surplus as damages.[27]

Commercial reasonableness is a question of fact[28] "to be determined on a case-by-case basis, in light of the totality of the circumstances surrounding the particular sale and in the context of the particular industry in which the sale took place."[29] "Whether a sale was commercially unreasonable is, like other questions about 'reasonableness,' a fact-intensive inquiry; no magic set of procedures will immunize a sale from scrutiny."[30]

Although the UCC does not define "commercial reasonableness," it does furnish some pertinent guidance to the meaning of that term. Part of that guidance is cautionary: "[t]he fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner." Former MD. CODE ANN., Com. Law § 9–507(2).[31] While

---

24. *Ruden v. Citizens Bank & Trust Co. of Md.,* 99 Md.App. 605, 638 A.2d 1225, 1228 (Ct. Spec.App.1994). "If, on the other hand, there is a surplus beyond the amount necessary to satisfy the debt and the reasonable expenses of repossessing and disposing of the collateral, the creditor must account to the debtor for such surplus." *Id.* at 1228 n. 1.

25. Former MD.CODE ANN., Com. Law § 9–507(1). *See also* MD.CODE ANN., Com. Law §§ 9–625, 9–626 (2007), the current provisions in Revised Article 9.

26. *Gambo v. Bank of Maryland,* 102 Md.App. 166, 648 A.2d 1105, 1114 (Ct.Spec.App.1994); *see also Ruden,* 638 A.2d at 1231–33.

27. *See* 4 WHITE & SUMMERS, *Uniform Commercial Code,* § 34–18 at 461–62 (4th ed. 1995) (explaining that "courts under 9–507(1) should usually allow the debtor the difference between the fair market value of the collateral

(*i.e.,* what the resale would have brought if properly conducted) and the proceeds of the sale, and (2) then subtract from this sum what the debtor still owes on the debt") (footnote omitted); *see also* MD.CODE ANN., Com. Law § 9–625(d) (in Revised Article 9).

28. *Federal Deposit Ins. Corp. v. Rodenberg,* 571 F.Supp. 455, 461 (D.Md.1983) (noting that commercial reasonableness is a "question of fact, and therefore must be determined by the fact-finder"); *see also United States v. Conrad Pub. Co.,* 589 F.2d 949, 954 (8th Cir. 1978) (same, citing authorities).

29. ANDERSON, § 9–504:208 (footnotes omitted).

30. *In re Excello Press, Inc.,* 890 F.2d 896, 905 (7th Cir.1989).

31. The counterpart to § 9–507(2) in Revised Article 9 states that "[t]he fact that a greater

"[a] large deficiency might indicate the search for buyers had been inadequate . . . it might simply reflect a greatly depreciated piece of collateral."[32] Accordingly, "the primary focus of commercial reasonableness is not the *proceeds* received from the sale but rather the *procedures* employed for the sale."[33] Under former Article 9, if the procedures were commercially reasonable, "the size of the deficiency is irrelevant."[34]

 This does not mean that the price obtained by a chosen sale method is irrelevant. "Despite the disclaimer in [§ 9–507(2)], price is everything. The factors we consider in determining whether a sale was commercially reasonable are almost entirely proxies for price. . . . To realize a satisfactory price is the reason— and the only reason—why we force the secured creditor to do a commercially reasonable resale."[35] Hence, "[w]hile a low price is not conclusive proof that a sale has not been commercially reasonable, a large

discrepancy between sales price and fair market value signals a need for close scrutiny of the sales procedures," particularly where the secured creditor is also the purchaser.[36] "Disposition of the collateral at fire sale prices, when the evidence shows that the creditor made little or no effort to find a buyer, is not commercially reasonable."[37]

As to the procedures employed to dispose of collateral, the UCC identifies three general methods that will satisfy the standard of commercial reasonableness: "If the secured party either [1] sells the collateral in the usual manner in any recognized market therefor or if he [2] sells at the price current in such market at the time of his sale or if he [3] has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner." Former MD.CODE ANN., Com. Law § 9–507(2).[38] (These

---

amount could have been obtained by a collection, enforcement, disposition, or acceptance at a different time or in a different method from that selected by the secured party is not of *itself sufficient to preclude the secured party* from establishing that the collection, enforcement, disposition, or acceptance was made in a commercially reasonable manner." MD.CODE ANN., Com. Law § 9–627(a). However, Revised Article 9 now provides a special rule for calculating the surplus or deficiency where, as in the present case, the secured party has acquired the collateral. In that event, if the sale proceeds were "significantly below the range of proceeds that a complying disposition to a person other than the secured party . . . would have brought," then "[t]he surplus or deficiency following a disposition is calculated based on the amount of proceeds that would have been realized in a disposition complying with this part to a transferee other than the secured party. . . ." *Id.*, § 9–615(f).

**32.** *Excello Press*, 890 F.2d at 905.

**33.** *In re Zsa Zsa, Ltd.*, 352 F.Supp. 665, 669 (S.D.N.Y.1972), *affirmed without opinion*, 475

F.2d 1393 (2d Cir.1973) (emphasis in the original).

**34.** *Excello Press*, 890 F.2d at 906.

**35.** 4 WHITE & SUMMERS, *Uniform Commercial Code*, § 34–11 at 398, 401 (5th ed. 2002) (hereinafter "WHITE & SUMMERS").

**36.** *Connex Press, Inc. v. Int'l Airmotive, Inc.*, 436 F.Supp. 51, 56 (D.D.C.1977) (applying Maryland law) (internal quotation marks and citations omitted). *See also* Official Comment (2) to current MD.CODE ANN., Com. Law § 9–627 ("While not itself sufficient to establish a violation of this Subtitle, a low price suggests that a court should scrutinize carefully all aspects of a disposition to ensure that each aspect was commercially reasonable").

**37.** *Gambo*, 648 A.2d at 1115.

**38.** "However, none of the specific methods of disposition set forth in subsection (2) is to be regarded as either required or exclusive, provided only that the disposition made or about to be made by the secured party is commercially reasonable." *Id.*, Official Comment (2).

three safe harbor methods of liquidating collateral have been carried forward without substantive change in Revised Article 9.[39]) The concept of a "recognized market" in the first two approved methods "is quite limited; it applies only to markets in which there are standardized price quotations for property that is essentially fungible, such as stock exchanges."[40] More widely applicable is the third approved method, which, as described in the Official Comment to former § 9–507(2), ordinarily "is for the secured party to sell the collateral to or through a dealer—a method which in the long run may realize better average returns since the secured party does not usually maintain his own facilities for making such sales."[41]

 Typically, therefore, "[r]easonableness calls for utilization of recognized methods as they are practiced in the particular trade."[42] Numerous courts have stated that commercial reasonableness "means that the disposition shall be made in keeping with prevailing trade practices among reputable and responsible business and commercial enterprises engaged in the same or a similar business."[43] Thus, to evaluate the commercial reasonableness of a particular foreclosure sale, a court normally "must consult 'customs and usages that actually govern the members of a business calling day-in and day-out [that]

not only provide a creditor with standards that are well recognized, but tend to reflect a practical wisdom born of accumulated experience.'"[44]

 NHP argues that the standard of commercial reasonableness imposes a strict duty on the creditor to "use his best efforts to see that the highest possible price is received for the collateral."[45] However, a reasonableness standard connotes greater flexibility than a best efforts standard, and as Professor Anderson notes, "[w]hen the framers of the Code contemplated 'best efforts,' as in an exclusive dealing contract, the framers expressly so stated."[46] They did not expressly so state in former Sections 9–504 and 9–507. Although courts in some other jurisdictions have said that the UCC requires secured creditors to use "best efforts" in liquidating collateral,[47] Maryland courts have not equated commercial reasonableness with a "best efforts" standard so far as we are aware. To the contrary, in *Kline v. Central Motors Dodge, Inc.*, Maryland's highest tribunal stated that the requirement of a "commercially reasonable" sale in § 9–504(3) has substantially the same meaning as the requirement of a "bona fide" sale in the retail installment sales context—in essence, that the "seller would exercise reasonable care, prudence, and diligence" in carrying out the sale.[48]

**39.** *See* Md.Code Ann., Com. Law § 9–627(b) (2007).

**40.** Md.Code Ann., Com. Law § 9–627 (2007), Official Comment (4); *see Gambo*, 648 A.2d at 1114 n. 11.

**41.** Former Md.Code Ann., Com. Law § 9–507(2), Official Comment (2).

**42.** *Liberty Nat'l Bank*, 540 F.2d at 1382 (footnote omitted).

**43.** Anderson, § 9–504:209 (footnote omitted).

**44.** *Excello Press*, 890 F.2d at 906 (quoting *Bankers Trust Co. v. J.V. Dowler & Co.*, 47 N.Y.2d 128, 417 N.Y.S.2d 47, 390 N.E.2d 766, 769 (1979)).

**45.** 2 Grant Gilmore, *Security Interests in Personal Property*, § 44.5 at 1234 (1965).

**46.** Anderson, § 9–504:388 (footnote omitted). *See, e.g.,* UCC § 2–306(2).

**47.** *See, e.g., Chittenden Trust Co. v. Maryanski*, 138 Vt. 240, 415 A.2d 206, 208–09 (1980).

**48.** 328 Md. 448, 614 A.2d 1313, 1314 (1992).

To the extent that the "best efforts" formulation appears to demand more, it may be symptomatic of an unfortunate "tendency to overestimate the ease of sale and to underestimate the cost and difficulty." [49] Maryland courts, though, have not been insensitive to the practical difficulties of obtaining full value in foreclosure sales.[50] Moreover, it surely is not commercially reasonable to "require the creditor to make efforts and expenditures beyond the point of diminishing returns." [51] We agree with Professor Anderson that "best efforts" is an overstatement, and that the UCC "only places upon the creditor the good faith duty to use reasonable means to see that a reasonable price is received for the collateral." [52] Under former § 9–507(2), "a creditor may fall short of using best efforts and fall short of obtaining the highest price, but still comply with the standard of commercial reasonableness...." [53]

### 2. Evidence that MCAP's Disposition of the Collateral Was Commercially Unreasonable

■ The collateral securing the Note in this case was specialized and unusual—interests in a limited partnership whose sole asset was Cherry Branch Townhomes, a 172–unit affordable housing project in Maryland. The housing project was subject to HUD regulations; in fact, there was testimony at trial that any would-be acquirer of the collateral at a foreclosure sale would need to secure HUD approval. Testimony also established that, in proceeding to liquidate this specialized collat-

eral, MCAP did not attempt to utilize any of the "safe harbor" methods listed in Section 9–507(2). MCAP made no effort to find likely purchasers in the housing industry or to market it to such potential purchasers, either directly or by contacting brokers and advertising in trade publications or other industry media. MCAP did not investigate the possibility of a private sale of the collateral to an entity engaged in owning and operating housing projects. Instead of undertaking a targeted outreach to members of the housing industry who might be most interested in owning a housing project, MCAP's only marketing effort was to place four fine-print ads for a public auction of the collateral in the classified advertising section of *The Washington Post.* MCAP scheduled and held the auction less than one month after the first ad ran on January 4, 2000.

The classified ads elicited inquiries from three persons. The record does not establish the qualifications of these inquirers or their ability to acquire the collateral in question. It appears that none of them pursued their initial expressions of interest, and they did not attend the auction. MCAP was the only bidder on the collateral. The adequacy of MCAP's bid, which was not supported by a contemporaneous appraisal, was a subject of vigorous dispute at trial; NHP proffered evidence that the price was unreasonably low, while MCAP countered with testimony that the partnership interests in KALP were worth comparatively little—less than the amount due on the outstanding HUD mortgage on

---

**49.** WHITE & SUMMERS, § 34–11 at 419.

**50.** *See, e.g., Hurlock Food Processors Inv. Assocs. v. Mercantile–Safe Deposit & Trust Co.,* 98 Md.App. 314, 633 A.2d 438, 452–53 (Ct. Spec.App.1993).

**51.** ANDERSON, § 9–504:388 (footnote omitted).

**52.** *Id. Cf.* WHITE & SUMMERS, § 34–11 at 419 ("If the creditor puts forth what seems to be a good faith effort, this should be enough unless it is plain that the effort was commercially unreasonable.").

**53.** ANDERSON, § 9–504:388.

Cherry Branch. The trial judge did not resolve this factual dispute.

█ NHP challenged the commercial reasonableness of MCAP's advertising effort and its decision to sell the collateral at a public auction rather than through private channels. Courts in Maryland and elsewhere have recognized that advertising specialized collateral only in newspapers and periodicals of general circulation is likely to be inadequate; such collateral may need to be advertised "in specialized trade or commercial publications, and [through] specialized dealers." [54] Creditors who are unfamiliar with the relevant market have a duty to investigate the appropriate channels for disposing of their collateral. If need be, "the creditor[ ] should consult the debtor—if they are on speaking terms—or should ask an expert about the market." [55]

The commercial reasonableness requirement also applied to MCAP's choice to hold a public auction rather than a private sale. The Official Comment to former § 9–504 specifically acknowledges that a public sale may not be appropriate in some situations:

Although public sale is recognized, it is hoped that private sale will be encouraged where, as is frequently the case, private sale through commercial channels will result in higher realization on collateral for the benefit of all parties. The only restriction placed on the secured party's method of disposition is that it must be commercially reasonable.[56]

As with other aspects of the disposition of collateral, "[t]he choice of public versus private sale ... depends on the circumstances." [57]

In rejecting NHP's challenge, the trial judge stated that "[t]here is no evidence in this case that a different type of notice, or private sale, is the accepted practice in the sale of partnership interests in real property." In fact, however, there was such evidence. NHP adduced testimony from three experienced industry representatives that MCAP's marketing and sale of the collateral was contrary to industry norms: typically, interests in affordable multifamily housing are sold to a small community of investors through brokers and industry contacts, not through classified advertising in newspapers and public auctions. Thus, an executive vice-president of AIMCO ex-

---

**54.** WHITE & SUMMERS, § 34–11 at 415; *see, e.g., Harris v. Bower,* 266 Md. 579, 295 A.2d 870, 875 (1972) (creditor did not advertise yacht "in any of the customary yachting publications" or "place it with a yacht broker"; "[a]nyone knowledgeable in this field would surely have predicted that a single advertisement in the Washington Star would be unproductive, as indeed it turned out to be"); *Connex Press,* 436 F.Supp. at 57 (applying Maryland law) (holding that merely placing classified ads in *The Wall Street Journal* and a single trade publication did not constitute a commercially reasonable method of publicizing the sale of a jet aircraft); *Contrail Leasing Partners, Ltd. v. Consolidated Airways, Inc.* 742 F.2d 1095, 1099 (7th Cir.1984) (upholding trial judge's finding that foreclosure sale of aircraft was not commercially reasonable because a single "inconspicuous ad in one

publication of the used-aircraft trade" was not adequate notice of the sale); *Liberty Nat'l Bank,* 540 F.2d at 1381–82 (affirming finding of unreasonableness in creditor's failure, *inter alia,* to advertise oil drilling rig in appropriate trade or commercial journals and to contact potential industry purchasers directly or through a professional auctioneer).

**55.** WHITE & SUMMERS, § 34–11 at 402.

**56.** Former MD.CODE ANN., Com. Law § 9–504, Official Comment (1).

**57.** *Excello Press,* 890 F.2d at 905. *See generally* Richard C. Tinney, Annotation, *What is "Commercially Reasonable" Disposition of Collateral Required by UCC § 9–504(3),* 7 A.L.R.4th 308 (2007).

plained that the "ordinary course" is to sell multifamily properties through specialized brokers to "a very unique, specialized investor base," and that the "major participants in this field" do not use auctions or publicize the sale of affordable properties in classified newspaper advertisements. The AIMCO executive testified that the auction process utilized by MCAP is not an "optimal way to maximize value" from such assets, not only because the investor pool is limited, but also because the valuation analysis is so difficult and the regulatory approval process so cumbersome.

That testimony was corroborated by a second witness, a real estate developer and former NHP employee who remained involved with another national firm in the acquisition and disposition of federally regulated affordable housing properties. She explained that "these properties have so many regulations that there really is usually a fairly small community of prospective purchasers. And the process of doing it through an auction or just another form of general advertisement typically comes up dry.... So we would not expect to be successful in selling property that way." "As a purchaser," this witness added, "I typically don't look in the newspaper. I typically do go to other people in the industry—lawyers, accountants, and now there is a growing group of real estate brokers who are experienced in dealing with this ... these properties." Finally, even MCAP's real estate investment expert, an active purchaser and seller of interests in multifamily properties, acknowledged that he learned about potential acquisitions through "word of mouth, through real estate brokers, and through lenders"—"never," he said, from *The Washington Post.*

The foregoing testimony was not contradicted. There was evidence, which the trial judge noted, of a single occasion when AIMCO conducted a public sale in Philadelphia using newspaper advertisements to liquidate limited partnership interests in a HUD-regulated housing project. The parties have disputed whether the circumstances of that sale were comparable to those of MCAP's sale of the interests in KALP. NHS contends that the comparison is inapposite because the seller and the debtor in the Philadelphia sale were the same entity and the disposition was not intended to be commercially reasonable.[58] Be that as it may—MCAP disagrees, and the trial judge made no findings on the question—the evidence established that AIMCO's reliance on classified ads and a public auction in the Philadelphia sale was an aberration. Moreover, in attracting bidders, the marketing effort in that sale was unsuccessful, as no one, other than the seller, bid on the collateral in question. While we would be inclined to defer to the trial judge's assessment of the significance of the Philadelphia sale, we find it difficult to perceive how that exceptional and unproductive disposition of collateral has much bearing on the question of commercial reasonableness. If anything, the Philadelphia sale appears to confirm that a public auction of housing partnership interests that are marketed only via classified ads in a general circulation newspaper is not likely to attract meaningful interest; hence it is not a commercially reasonable disposition of such collateral.

■■■ As previously noted, commercial reasonableness is a question of fact. We may reverse the trial judge's finding of that ultimate fact only if we deem it to be clearly erroneous, *i.e.,* "plainly wrong or

**58.** Where the secured creditor and the debtor have reached a "specific agreement" about how the sale is to be conducted, the question of commercial reasonableness may be "immaterial." *Becknell v. First Nat'l Bank,* 740 F.2d 609, 610 (8th Cir.1984).

without evidence to support it." [59] At this stage, we are not prepared to draw that conclusion. We do not have the benefit of the trial judge's assessment of the credibility of the three industry witnesses whose pertinent testimony we have summarized above. Moreover, even discounting the Philadelphia sale and that the classified ads in *The Washington Post* did elicit some expressions of interest, the trial record contains other countervailing evidence suggesting that—in the particular circumstances of this case—MCAP's chosen method of disposition may not have been commercially unreasonable.

First, it should not be overlooked that MCAP gave notice of the foreclosure sale to NHP and its parent AIMCO, entities with extensive contacts in the affordable multifamily housing industry. NHP may have been confident that it could not be held liable for any deficiency, but it still retained an interest in maximizing the proceeds of the sale, even if only for the chance that there might be a surplus. NHP, which went to considerable lengths at trial to emphasize the appraised worth and potentially high market value of Cherry Branch, contends that there should have been a surplus. NHP also had a potential stake in who purchased the collateral because it hoped that KALP or its acquirer would repay its loans to KALP. Thus, NHP and AIMCO arguably had incentives to market the collateral to the industry, even if they had no legal obligation to do so.[60] Therefore, it may be appropriate to credit MCAP with having done more to publicize the sale to the relevant investor community than merely place a few classified ads.

Second, NHP's actual, contemporaneous behavior may be revealing. According to MCAP's expert witness, NHP's willingness to forfeit the collateral in a foreclosure proceeding was, in itself, a strong negative signal to other potential investors, an indication that the partnership interests in Cherry Branch would not be a sound investment. (Moreover, any serious potential investor likely would have asked NHP about its decision to give up Cherry Branch. What would such investigation have revealed?) Furthermore, NHP did not object to MCAP's arrangements to dispose of the collateral, propose other arrangements, or undertake to drum up interest on the part of possible investors. In fact, the ensuing litigation proceeded for a few years before NHP ever claimed that the sale was commercially unreasonable. The trier of fact might infer from NHP's inactivity and silence that NHP, a knowledgeable industry participant, knew full well that the collateral was unmarketable.

Third, there is independent evidence suggesting that additional efforts to market the partnership interests in KALP would have been a waste of time and resources. Any purchaser would have faced NHP's $3 million loan claim, which would have discouraged investor interest and reduced the market value of the collateral. In addition to confronting that alleged debt, any purchaser would have assumed liability for the outstanding HUD-insured mortgage, on which approximately $1.7 million still was owed. And according to MCAP's expert, other risk factors further

**59.** D.C.Code § 17–305(a) (2001); *see, e.g., Jemison v. Nat'l Baptist Convention, USA, Inc.,* 720 A.2d 275, 281 (D.C.1998).

**60.** *Cf. Excello Press,* 890 F.2d at 904 (pointing out that "there may be good reason for believing that the failure to give notice [to the

debtor] decreases the likelihood that the sale was commercially reasonable, because lack of notice may remove from the process the party (the debtor) with the best ability to find buyers (and a good incentive to do so)").

undermined the value of the collateral and made it unattractive to potential investors: for instance, the need to expend approximately $1.4 million in projected maintenance and renovation expenses for Cherry Branch and MCAP's inability to provide a purchaser with appropriate representations and warranties concerning the property. Given all of these problems, MCAP's expert opined that at the time of foreclosure, the collateral was worth less than the HUD mortgage that accompanied it—meaning that no rational investor would have bid for it. Even if that valuation estimate is unduly low—NHP vigorously disagreed with it, and, after all, MCAP did pay $1.4 million—there was evidence that the collateral appeared to be a distinctly poor investment.

Accordingly, on the existing record, we are not prepared to hold that the ultimate finding of commercial unreasonableness was clearly erroneous. Nor are we about to usurp the prerogative of the trial judge to weigh the conflicting evidence. Having determined that the judge overlooked important testimony and based her decision on a clearly erroneous subordinate finding—that "no evidence" of commercial unreasonableness was presented—we are constrained to remand the case for reconsideration in light of all the evidence of record.[61] If such reconsideration on the existing record is impracticable, a new trial will be required. Should the trier of fact determine on remand that the foreclosure sale was not conducted in a commercially reasonable manner, it may be necessary to find the fair market value of the collateral at the time of the sale. This latter finding may be necessary even if NHP is not liable for any deficiency, given NHP's claim that commercially reasonable procedures would have resulted in a surplus.

### C. Compulsory Counterclaim

NHP's proposed counterclaim for the surplus that allegedly would have resulted from a commercially reasonable disposition was compulsory within the meaning of Civil Rule 13(a).[62] "When a pleader fails to set up a counterclaim through oversight, inadvertence, or excusable neglect, or when justice requires, the pleader may by leave of Court set up the counterclaim by amendment."[63] Particularly where the counterclaim is compulsory, the trial court "should be liberal in the exercise of its discretion" to allow a late filing.[64]

The trial judge denied NHP's proposed compulsory counterclaim solely on the premise that NHP was attempting to resurrect the claim it previously had raised without success in Count III of its Second Amended Complaint. That premise was mistaken, however. Count III sought to

---

61. *See, e.g., In re C.J.,* 514 A.2d 460, 462–64 (D.C.1986) (reversing judgment in a bench trial, although there was sufficient evidence to support the judge's ultimate finding, because "the trial judge's [subordinate] findings contain factual statements that are unsupported by the record," and "the possibility exists that . . . the trier of fact was swayed by erroneous factual matter").

62. Superior Court Civil Rule 13(a) describes a compulsory counterclaim as one that "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudica-

tion the presence of 3rd parties of whom the Court cannot acquire jurisdiction."

63. Super. Ct. Civ. R. 13(f).

64. *Bronson v. Borst,* 404 A.2d 960, 963 (D.C. 1979). The criteria to be considered include "the number of such requests, the length of the pendency of the trial, the number of previous continuances, the existence of bad faith or dilatory motive, the merit of the counterclaim, and the existence of prejudice to the other party." *Id.* (citation omitted).

**322**

establish NHP's right to a putative surplus based on its loans to KALP. The motions judge disposed of that claim on the ground that the loans were included in the collateral and, hence, were extinguished by the foreclosure. In contrast, the proposed counterclaim sought to establish NHP's right to a hypothetical surplus based on the commercial unreasonableness of MCAP's disposition of the collateral. The summary judgment ruling did not dispose of that different claim, because it left the issue of commercial reasonableness to be decided after trial. Since the trial judge denied leave to file the proposed counterclaim on the erroneous ground that it was the same as Count III, we reverse the ruling and remand this issue for reconsideration of NHP's motion.[65]

### D. Other Issues

The remaining issues on appeal, which are legally and factually complex, concern (1) the proper interest rate on the deficiency judgment; (2) the reasonableness of the attorneys' fees and costs incurred by MCAP in foreclosing on the collateral, defending against NHP's lawsuit, prosecuting its claim for a deficiency judgment, and litigating the interest and fees issues; and (3) MCAP's entitlement to interest on its claimed attorneys' fees and costs. It would be premature to reach these remaining issues, given our ruling that MCAP's right to a deficiency judgment and the commercial reasonableness of its disposition of the collateral remain to be decided. For example, if NHP is found not liable for the deficiency, there will be no question of interest on any deficiency judgment, and any claim by MCAP for attorneys' fees will be markedly different and require further proceedings in the tri-

al court. We therefore remand this case without addressing the interest and fees issues that the parties have raised, without prejudice to their reassertion of those or related issues at an appropriate time.

### III.

In conclusion, we reverse the award of summary judgment to MCAP with regard to the issue of NHP's liability for any deficiency and remand for trial on that issue. We affirm, however, the award of summary judgment to MCAP on NHP's claim that its loans to KALP survived MCAP's foreclosure on the collateral. Additionally, we reverse the decision that the foreclosure sale was commercially reasonable and remand for the trial court to reconsider that question in light of all the evidence adduced at trial or, if such reconsideration is not practical, to hold a new trial on the question. We also reverse the denial of NHP's motion for leave to assert a compulsory counterclaim for any surplus that should have been generated by a commercially reasonable disposition of the collateral. Finally, we defer consideration of the interest and attorneys' fees issues, which, depending on the outcome of further proceedings on the other issues, may have to be redetermined by the trial court. The case is remanded to the trial court for further proceedings consistent with this opinion.

*So Ordered.*

---

65. Allowance of the counterclaim may not necessitate reopening of the trial for anything more than additional argument. It is not clear that either side would have presented or elicited any additional evidence had NHP's counterclaim been permitted.